Samuel J. Joseph, J.
Plaintiffs seek to recover damages for breaches of contracts, an accounting, and other equitable relief. Three written contracts between defendant Pathe Industries, Inc., and the plaintiffs form the basis for plaintiffs’ claims. By permitted assignments the present plaintiffs Madison Pictures, Inc., B. & B. Pictures Corp., and Commodore Pictures Corporation, are the plaintiffs herein. The defendants are Pathe Industries, Inc., Pictorial Films, Inc., and Pathe Laboratories, Inc., the two last-mentioned formerly wholly owned subsidiaries of defendant ‘ ‘ Pathe ’ ’.
The plaintiffs will hereinafter be designated as “ Madison ”, “ B. & B.” and “ Commodore the defendants “ Pictorial ”, ‘ ‘ Pathe ’ ’ and ‘‘ Laboratories ’ ’. References hereinafter made to P. R. C. Pictures, Inc., Eagle Lion Films, Inc., and Eagle Lion Classics, Inc., are corporations that are divisions of “ Pathe ”, its wholly owned subsidiaries. Chesapeake Industries, Inc., (hereinafter referred to as ‘‘ Chesapeake ”) is a successor corporation to Pathe Industries, Inc. In view of the fact that “ Pathe ” was the contracting party, the court shall make reference to “ Pathe ”, not “ Chesapeake ”, throughout its decision.
At the conclusion of the trial the plaintiffs withdrew the allegations contained in paragraphs 50 and 51 of the second cause of action against defendant Pathe. The third, fourth, fifth, sixth and eighth causes of action were withdrawn or dismissed. The first, second and seventh causes of action remain for disposition. Three counterclaims of the defendants were *306 disposed of either by dismissal, withdrawal or stipulation of indebtedness.
There are three contracts, respectively dated December 3, 1945 (herein referred to as the “ First Contract ”), November 22, 1947 (herein referred to as the “ Second Contract ”), and December 31, 1948, actually executed on April 21, 1949 (herein referred to as the “ Third Contract ”) at issue. In each of the contracts the plaintiff or its assignor is referred to as the “Buyer” and the defendant Pathe is referred to as the “ Seller”. Each of the contracts covers world-wide distribution and exploitation rights of motion pictures owned by the defendant Pathe. Under the First Contract plaintiff Madison acquired all of Pathe’s right, title and interest in perpetuity to distribute, exhibit and exploit all pictures belonging to the 1940-1941 and 1941-1942 programs of Producers Releasing Corporation, Pathe’s predecessors (herein referred to as the “ Group A” pictures) in various gauges, territories and by television. Under the Second Contract, Madison acquired similar rights in all pictures belonging to the 1942-1943 and 1943-1944 programs of Producers Releasing Corporation (herein referred to as the “ Group B ” pictures). The Second Contract incorporated, by reference, provisions of the First Contract and was substantially the same in all respects except that it related to other pictures belonging to 1942-1943 and 1943-1944 programs of Producers Releasing Corporation. Madison received the same rights in the same territories as in the First Contract. The first two contracts will be treated together herein. Under the Third Contract, Madison acquired the same rights, with certain exceptions, in the 1944 — 1945 and 1945-1946 programs of Producers Releasing Corporation (herein referred to as the “ Group C ” pictures). The rights granted under the first two contracts to plaintiff involved the right of distribution throughout the world both in theatrical presentation and in substandard gauge (16 mm. and 8 mm.) presentation and in television, both domestic and foreign. Plaintiff did not obtain 16 mm. and 8 mm. domestic rights. In the Third Contract plaintiff received world-wide foreign rights in 35 mm. and substandard gauge, as well as 35 mm. in domestic rights, but it did not receive substandard domestic rights or television rights in the United States and Canada.
With respect to foreign territories, there were certain limitations upon plaintiffs’ rights in each of the contracts. In the First Contract there was the following provision (par. 2[b]): ‘ ‘ Before Buyer shall undertake the distribution of any of the *307 motion pictures in any of the aforesaid foreign countries or territories he will consult with Seller for the purpose of ascertaining those territories and foreign countries in which unexpired written agreements are in effect and it is agreed that a list of said foreign countries and territories shall be prepared and signed by both parties hereto to identify the same. It is further agreed that upon the expiration of any presently unexpired written agreements in any foreign country or territory Buyer shall have the right to reissue the motion pictures in such territory or foreign country, provided that the expired contract shall not restrict the same. ’ ’
The Second Contract contained substantially the same provisions as the First Contract.
The Third Contract provided as follows: ‘ ‘ The buyer shall have the right to distribute the photoplays in any country or territory of the world outside of the domestic territory, except where bona fide unexpired distribution or exhibition agreements are now in effect and have been entered into before the date hereof by the Seller or any of its predecessors restricting such right of distribution which agreements are noted by the Seller on Schedule B annexed hereto and made a part hereof. Said Schedule B shows the names of the present distributor, or exhibitor for the territory, the date when said contract was entered into, the expiration date for the respective photoplays when there is a specific expiration date. The Seller warrants that after the expiration date with respect to any photoplays in presently unexpired contracts as set forth in said Schedule affecting any country or territory outside of the domestic territory, the Buyer shall have the exclusive right to distribute for exhibition or exploit by means of television the said photo-plays in such country or territory, provided that the unexpired contract as set forth in said Schedule shall not restrict the same, but if no restriction is noted on said Schedule B as to any particular photoplay, the expiration date therein shall be binding.” (Par. 2[e].)
It was further provided: ‘ ‘ It is agreed that the Seller will notify the Buyer as soon as any photoplay becomes available for distribution by the Buyer in any particular territory by reason of the expiration of contract restrictions with respect thereto.” (Par. 2[c].)
Under the first two contracts no list was ever actually prepared and signed by the parties reflecting the unexpired distribution agreements in effect at the time the respective contracts were entered into. In the case of the Third Contract, a Schedule B was prepared shortly after the execution of the *308 contract which purported to show territories as to which there existed “ bona fide unexpired distribution or exhibition agreements ” and giving expiration dates for the respective photoplays.
The basic terms of each of the contracts may be simply stated. Under the First Contract the Buyer agreed to pay $250,000 purchase price provided for in the contract to be paid out of 70% of gross receipts and revenues in seven years. This contract was subsequently amended on November 29, 1947 so that the Seller was entitled to receive 60% of the gross receipts and revenues and the Buyer 40% thereof until the balance of the sum of $250,000 was received by the Seller. By the same amendment, the minimum sum of $250,000 was required to be paid on or before six years from December 3, 1945 in lieu of the seven years originally provided.
The amendment also provided that after the Seller shall have received the sum of $250,000 out of gross receipts, the Seller shall then be entitled to receive 40% of gross receipts and revenues thereafter and the Buyer 60% thereof. In fact, the Seller actually received $250,000 as its share of the gross receipts by August, 1949; since that time plaintiff has retained 60% of the gross receipts and revenues and paid 40% thereof to Pathe.
Under the Second Contract, the gross receipts and revenues were to be divided 60% to Pa the and 40% to Madison until the minimum consideration under the Second Contract, which was $300,000, was fully satisfied; thereafter Madison was to receive 60% of gross receipts and Pathe 40%. The $300,000 was to be paid within seven years of the date of the agreement, or not later than November 22, 1954. The share of gross receipts and revenues actually paid to Pathe prior to November 22, 1954, was some $21,000 less than the $300,000 provided for in the Second Contract. In accordance with its terms, however, a payment of the claimed deficiency was made by plaintiff on November 22, 1954. B. & B. Pictures Corp., the assignee of Madison’s rights under the Second Contract, is presently recouping the deficiency payment by withholding Bathe’s 60% share of gross receipts and revenues until such time as the deficiency is fully recouped as provided in the contract. After the deficiency payment is recouped, the contract provides for continued payments to Pathe of only 40% of gross receipts.
Under the Third Contract, the gross receipts and revenues were to be divided 60% to Pathe and 40% to Madison until the minim-inn consideration of $300,000 was satisfied. The $300,000 was to be paid within seven years of the date of the agreement, *309 or not later than December 31, 1955. If the $300,000 note given under the Third Contract is reduced to the point where less than $65,000 is unpaid by December 31, 1955, the contract provides for an extension of three years. If the note is paid by a deficiency, the Buyer is entitled to recoup its deficiency payment and, in any event, after the payment of the note the Buyer is to receive 60% and Pathe 40% of the gross receipts. There has been paid upon it approximately $155,000, leaving a balance of about $145,000 unpaid.
The designations “ Buyer ” and “ Seller ” used in all three contracts are misnomers, since the relationship between the parties under the contracts was that of joint venturers; that a fiduciary relationship existed will hereinafter be pointed out.
The contracts further provide for mutual rights and obligations. In addition to the percentage arrangement for the participation by both parties in the gross receipts and revenues, plaintiffs agreed to use their best efforts to exploit the pictures, and Pathe undertook to furnish as many prints of the motion pictures as “ are necessary for use in said territory at the prices hereinafter set forth”. Pathe undertook to supply prints from negatives; it also undertook to deliver all prints at the laboratory. The plaintiffs were permitted to secure copyright registration and protection in the name of Pathe.
Under the first two contracts, before they were subsequently amended, the plaintiffs turned over to Pathe intact, with appropriate reports, the gross receipts, and Pathe was under a duty to transmit to the plaintiffs that portion of the proceeds of the venture which belonged to it, as well as to reimburse plaintiff out of gross receipts for recoupable expenses. Pathe undertook by clear implication, as well as by the interpretation given the contract by this court, to notify plaintiffs of the territories in which unexpired written agreements were in effect preventing plaintiffs’ exploitation of the motion pictures which were the subject of such unexpired agreements in such territories, and to further notify plaintiffs of the expiration of such unexpired written agreements with respect to such motion pictures.
The Third Contract embodies the same general relationship of the parties, but is even more precise with respect to the nature of the agreement as creating a joint venture, i.e., Madison received all of Pathe’s right, title and interest in perpetuity to distribute and exploit the motion pictures throughout the world, except as limited; the parties’divided the gross receipts and revenues thereof between them; Madison undertook to make certain advances and to look for reimbursement solely to the gross receipts of the venture; Madison agreed to deposit *310 the gross receipts of the pictures in a special bank account and to act as trustee for Pathe’s share. Various legal expenses in connection with the venture were to be shared by the parties, and all legal expenses were considered deductible expenses of the venture. Madison was permitted to secure copyright registrations where required in the name of Pathe; Madison undertook to use its best efforts to distribute the pictures throughout the territories and to endeavor to obtain the best possible rentals. Pathe assumed various continuing obligations: (1) To notify Madison as soon as any photoplays were available for distribution by Madison in any particular territories by reason of the expiration of contract restrictions with respect thereof. (2) To furnish to Madison as many prints of the photoplays as were necessary for use in the territory at the price set forth in the agreement. (3) To possess a fine grain duplicating positive print or a dupe negative for each photoplay. (4) To deliver promptly commercially acceptable prints. (5) To assume the cost of reconditioning negatives or of making or procuring dupe negatives. (6) To deliver prints at the laboratory. (7) To deliver to Madison all positive prints after October 1, 1949, as well as all advertising matter and accessories in its possession, free of charge, with certain exceptions. (8) To deliver an inventory of all positive prints of the photoplays in its possession. (9) To furnish to Madison censorship certificates in the various territories. (10) To furnish to Madison, without charge, photostats of the music cue sheets. (11) To furnish proof of copyright ownership or license in the photoplay. (12) To consent to the use of its name in application for copyright registration and protection.
The continuous nature of the obligations assumed by Pathe are specifically emphasized by the insertion of a force majeure clause permitting interruption of its continuing obligations by Pathe in certain circumstances. The continuing obligation is further emphasized by paragraph 36 which provides for the results that flow if Pathe “ commits a material breach of this agreement which is not cured within 30 days after notice.” The fact that Pathe could commit a material breach indicates that it had continuing obligations. There is also an express negative covenant on the part of Pathe in paragraph 16 which reads: “In no event shall the Seller permit exhibition of any of the photoplays after September 1, 1949.” There is also an express covenant to notify Madison of the results of all lawsuits present and future, as well as the expiration date of any photoplay which is the subject of a lawsuit on the termination of the lawsuit.
*311 The first cause of action alleged that the defendant Pictorial, a wholly owned subsidiary under the direction of the defendant Pathe, sold 16 mm. prints to third parties in foreign territories to which Madison had the 16 mm. rights, and that outright sales of prints in the United States were made to third parties, without any restriction as to territory or use, which violated the 16 mm. rights granted to plaintiffs under each of the three contracts.
Under each of the contracts, plaintiffs had the exclusive right of exploitation in substandard gauge (16 mm.) in all foreign countries except where unexpired agreements existed. There is no evidence that in any of the foreign territories here involved there were such restrictive agreements in force with respect to 16 mm. as to specific pictures involved in the claimed violation. Defendants have made numerous sales of prints to buyers located in such foreign territories.
The sale of such prints constitutes a violation of the contractual rights of the plaintiffs as well as a breach of the fiduciary relationship involved. A court of equity will not permit a wholly owned subsidiary unconscionably or wantonly to commit violations of agreements formerly entered into by its parent. A parent cannot escape liability for derelictions by its subsidiary.
The liability of Pathe is founded upon the theory of unjust enrichment, for whatever came into the coffers of Pictorial by virtue of its illegal acts came into the coffers of the parent (see Guardino Tank Processing Corp. v. Olsson, 89 N. Y. S. 2d 691 [Sup. Ct., 1949]).
The defendant contends that, unless the actual use of the 16 mm. rights in the foreign territories reserved for the plaintiff is shown, no breach has been established and that the sale of the prints was an innocuous transaction, to say the least. The vice in this situation is the fact that a fiduciary relationship exists. The defendants continuously disregarded the onus of joint venturers, aside from the fact that a grant of a copyright had been given. Since the foreign territorial rights were the plaintiffs’, neither the defendants nor their agents or subsidiaries could exercise dominion over those rights by selling them. Potential customers should have been referred to the plaintiffs, to whom the rights had been given. The defendants were barred from exploitation, having subsequently reserved to the coadventurer a grant. The proceeds of all sales in this category belonged to the joint venturer, regardless of the use to which they were put by the customers, and the defendants should be compelled to account for this particular invasion of plaintiffs’ rights.
*312 As to the outright sales of Pictorial and the realization that it only had domestic 16 mm. rights, two order forms were offered in evidence. One form contains upon its face a limitation of the availability of the pictures for five years, and that exhibitions aré limited to nontheatrical showings within the territorial limits of the United States; the other form simply states “ Special, Outright Sale, Order Form, Television Rights Reserved it made no reference to the reservation of any other rights with respect to territories. Pictorial embarked upon the procedure of selling prints outright, without limiting the buyer to any restriction whatever as to territory. Therefore, in making such sales, it not only gave the buyer the power to infringe upon the rights of the plaintiffs in foreign territories, but it also gave the defendant Pictorial the benefits of a sale which apparently included world-wide rights without restriction. Whether the vice is the actual use of the prints in the foreign territories or the sale of the prints themselves, the fact is the defendants were dealing with rights which were inherent in the plaintiffs by virtue of the contract. The defendant Pictorial, owning 16 mm. rights in the domestic territory, could not destroy with impunity the foreign rights of its fiduciary partner (see Underhill v. Schenck, 238 N. Y. 7 [1924]).
The arguments of the defendant that it sold prints, and not rights, and that in the sale of such prints no permission was given to use the prints by way of showing them upon a screen, are unacceptable to this court. The court cannot be so naive as to believe that the sale of the prints was without purpose other than to give the defendants valuable considerations which they received. These prints have a highly commercial purpose. They are not used for purposes of art, decoration of the home, or for storage in warehouses.
Plaintiffs have been as much defrauded of their rights and property by Pictorial’s activities as if the foreign outright sales had been made directly by plaintiffs’ coadventurer, Pictorial’s parent company, Pathe, for Pathe was unjustly enriched by breach of the very contract Pathe itself made with plaintiffs. The moneys derived by the wholly owned subsidiary were, in effect, Pathe’s. Realistically, Pathe and its subsidiary, which was to act as its domestic 16 mm. division, must be regarded as one and the same in this connection, and the fruits of the sales complained of should be treated as part of the joint venture between plaintiffs, or plaintiffs’ predecessors, and Pathe.
The defendant’s contentions are that the defendant cannot be held liable on the evidence for the acts of its wholly owned *313 subsidiary and that there is no evidence that Pictorial was the agent of Pathe, with express, implied, or apparent authority to act for and in behalf of Pathe.
The evidence discloses that Pictorial was a wholly owned subsidiary of defendant Pathe from at least 1946 to November 19, 1951 during the very period of time of all the claimed violations herein; during that period, Robert W. Purcell was chairman of the board of both Pathe and Pictorial, and M. M. Malone was secretary of both corporations; Pathe as the 100% parent elected the Pictorial board; Pathe referred to Pictorial as a division of itself and took responsibility for its business achievements; the relationship was fully expressed in the 1946 annual report of Pathe. Some part of the proceeds derived from Pictorial operations was paid directly to Pathe: the acquisition of funds, in violation of plaintiffs’ rights, was received by the parent company and its subsidiary.
The court finds, from the evidence, that notice had been brought home to Pictorial of the existence of plaintiffs’ 16 mm. rights, and that the board of directors of Pathe participated in policy decisions of Pictorial.
The court holds that the consideration received for these prints included a consideration for the potential exploitation of the prints throughout the world, and that, in so doing, the defendants violated the contractual rights of the plaintiffs, breached their fiduciary relationship and will be required to account for the receipts derived therefrom for the purposes and benefits of the joint venture.
The second cause of action alleged various wrongdoings and breaches of contract on the part of the defendants.
A. Plaintiffs claim that ‘ ‘ Pathe ’ ’ unlawfully granted licenses to exploit by means of television the third group G photoplays which were the subject of the Third Contract between Pathe and Madison, in which Madison was granted the exclusive right to exploit theatrically in 35 mm. Plaintiffs contend that this was a breach of an implied covenant not to compete unfairly with Madison. It is further alleged, that under each of the contracts Madison had exclusive rights to exploitation in 35 mm., 16 mm., and, in the first two contracts, by means of television throughout the world, except that it could not exploit in 16 mm. in the United States.
B. Plaintiffs charge defendants with blocking in various foreign territories by virtue of either alleged unexpired existing distribution agreements, or because of pending lawsuits or both.
C. The defendants failed to notify plaintiffs of the cancellation of prior contracts in foreign territories.
*314 D. Defendants sold in territories where rights were exclusively granted to plaintiffs, after the existence of plaintiffs’ rights to exploit pictures in such territories.
With respect to subdivision A, the defendant shortly after the execution of the Third Contract, granted television rights first to KTTV, Inc., and then, in perpetuity, to Wilton Pictures, Inc. Plaintiffs claim, that the granting of these television rights constituted a breach of an implied covenant not to compete unfairly with the plaintiffs. The defendants claim that it reserved the right to exploit by television, and that since there was no express limitation upon that right, it could do so with impunity. The court does not find that there was any express reservation by the defendant to exploit against the plaintiff in the television medium. The contract itself merely excepts, from the rights given to the plaintiff, the right to exploit by means of television in the domestic territory. It does not reserve to the defendant the right to use the television medium with respect to these same photoplays. The failure specifically to reserve any such right by the defendant is highlighted by the fact that it did insert a specific clause that “ Seller shall have the right to license for exhibition or sell in the territory any and all motion pictures controlled by the Seller but not included in this agreement or existing agreements heretofore entered “into by the Buyer with the Seller ’ ’. There is no clause which specifically reserves the right to the Seller to exploit the pictures involved by means of television.
There is a clear distinction between the retention or reservation of rights, and providing for the right to make competing use of such rights. The Third Contract mentions television in a context which plainly was intended only to delimit the exploitation rights granted to the Buyer and not to authorize destructive competition by the Seller through exploitation of the ungranted rights. The provision in question in the Third Contract reads: “ The Buyer shall have the right to distribute, exhibit and exploit the photoplays throughout the territory of the United States * * * except by means of television”.
In this situation the defendant, having granted the theatrical domestic rights, almost immediately turned around and disposed of the television rights restricting the purchaser in no way from competing with the plaintiff. It is this state of facts that gives rise to the cause of action. Defendant does not deny that the pictures were extensively played throughout the United States, nor is it denied that the contract with Wilton Pictures which gave Wilton television rights in the domestic territory in perpetuity was executed shortly after the contract between *315 plaintiff and defendant. It is also conceded by stipulation that all the pictures involved in the Third Contract had been played on television by 1951, within a period of less than two years subsequent to the making of the original Third Contract.
Here we have an agreement between the parties to share in gross revenues, to participate with each other in the good faith that the law implies, for each to carry out the mandate of his own obligation. In such case the parties stand as coadventurers, just as much as the parties stood in that relationship in Underhill v. Schenck (238 N. Y. 7, 15, supra). See, also, Kirke La Shelle Co. v. Armstrong Co. (263 N. Y. 79) citing the Underhill case. There is no difference between the relationship of proprietor of a play and producer, who is given the rights to produce it, and the relationship of parties who share in the exploitation of motion pictures on a joint participation basis.
Nor does a provision in a contract that the relationship is not one of partnership bind the court in determining the true relationship of the parties (Martin v. Peyton, 246 N. Y. 213, 218 [1927]; Rubinstein v. Small, 273 App. Div. 102 [1st Dept., 1947]; Reynolds v. Patrick, 198 Misc. 201 [1950]).
It can hardly be said that the defendant was unaware of the possibility of suggesting a clause that might have given it protection; in one part of the contract it did provide for its own right to compete with plaintiff as to other pictures of its own in various territories of the world. Although it would have been easy to insert a similar clause with respect to the right to compete with the plaintiff in television, I find no such clause. It is difficult to assume, therefore, that the matter was one that did not come into the ken of the defendant, nor one which it disregarded as unnecessary. The very insertion of the clause protecting its right to compete in the territories granted in the theatrical medium emphasizes its failure to make such a suggestion with respect to television. Nor can it be said that the tendering of such a restrictive clause would have commanded acceptance from the plaintiff. Once the defendant committed itself to the joint venture, it committed itself to the highest degree of responsibility toward its coadventurer, the plaintiff. It became no longer a matter of phrases and commas, but of the utmost good faith in permitting the plaintiff to enjoy the fruits of the venture without interference by the defendant.
This defendant claims that it did protect itself under the contract, not by a specific clause giving it the right to exploit by television against the plaintiff’s theatrical rights, but by a general clause as follows: “ 38. This agreement * * * expresses the entire agreement between the parties hereto and *316 there are no oral or implied representations, guarantees or conditions not contained herein.”
Such a clause has no meaning in the face of the settled doctrine of law. It is as if a general clause were to say that an implied condition to co-operate with the other party to a joint venture may be effaced by a general and vague language. Aside from the circumstance that the law implies a “ covenant ” and not ‘ ‘ a representation, guarantee or condition ’ ’, rights founded upon equitable principles cannot be so lightly bargained away. To destroy an implied covenant as deeply rooted in equity as this one would require specific language to indicate that the matter was brought home to the parties and that they, on a consensual basis clearly expressed, agreed to reject the rule of law.
The defendant may not rely upon the contention that it was incumbent upon the plaintiffs to provide for the period during which they were to use their rights without the disastrous competition of television, for the defendant itself drew such a time limitation clause in connection with its own right to continue the exploitation of the photoplays involved in the agreement, by providing that it could exploit those until September 1, 1949. The absence of a similar provision for the benefit of the defendant can hardly be charged to the plaintiffs.
This court is not unmindful that a picture shown on television is viewed by many many thousands of people at one showing. No amount of motion picture exhibition in enclosed theatres can possibly attract as great audiences as are attracted by the medium of television. To recite this fact is to recite the obvious. If it is a fortiori that television hurts motion picture theatrical exhibition, then the rule of law laid down in the cases cited herein is a perfect precedent; but precedent aside, it would be quite anomalous to hold that a plaintiff, granted exclusive rights for domestic theatre exploitation, could be given such rights on the one hand and have them taken away in practical effect by the other. This must follow as a matter of law even if the parties had been dealing at arm’s length, because the covenant implied in law would prevent a destruction of that portion of the copyright estate granted.
The law with respect to this television situation has been fully enunciated by three of our most learned Judges.
Judge Cabdozo put it in Underhill v. Schenck (238 N. Y. 7, 15, supra): ‘ ‘ The point of departure for one who embarks on that inquiry is the decision of the Supreme Court of the United States in Manners v. Morosco (252 U. S. 317).” What Judge Cabdozo was referring to was a doctrine enunciated earlier by Judge *317 Hough in Harper Bros. v. Klaw (232 F. 609, 613) cited with approval by Mr. Justice Holmes in Manners v. Morosco (252 U. S. 317, 327): “As was said by Judge Hough in a similar case there is implied a negative covenant on the part of the [grantor] not to use the ungranted portion of the copyright estate to the detriment, if not destruction, of the licensees’ estate. Admittedly if Harper Bros, (or Klaw and Erlanger, for the matter of that) permitted photo-plays of Ben Hur to infest the country, the market for the spoken play would be greatly impaired, if not destroyed ’. ’ ’
Defendants rely upon an expressed agreement in the three contracts that there are no oral or implied representations, guarantees or conditions not contained therein, and section 152 of the Personal Property Law. The Court of Appeals in Kirke La Shelle Co. v. Armstrong Co. (263 N. Y. 79, 87, supra [1933]) in explaining the rationale of the decisions relied on by the plaintiffs in the case at bar, stated: “ In the last analysis those cases only apply the principle that in every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing.”
Such a covenant is not ruled out, as defendants suggest, by a general clause in a contract which recites that there are no “ oral or implied representations ” etc.
The cases cited by defendants in support of their proposition are cases under section 152 of the Personal Property Law, dealing with a shifting of the risks involved as to the quality and condition of the goods and wares under contract. It is one thing to sanction a shift of the risks as to the quality of merchandise, and quite another to construe a general clause as authorizing unfair competition and unfair dealing by a fiduciary.
Defendants ignore the crucial difference between a mere mention of television in defining the scope of the rights to be exploited by plaintiffs for the joint venture, and a provision, which does not exist here, allowing defendant Pathe to exploit the television rights in destructive competition with the rights granted plaintiffs.
Defendants cite McClintic v. Sheldon (182 Misc. 32) reversed by the Appellate Division, First Department (269 App. Div. 356 [1945]), presumably to support the contention that the mention of television in defining the grant to plaintiffs (which defendants vaguely characterize as making ‘ ‘ express provision for the television rights ”) renders inapplicable the authorities *318 relied on by plaintiffs in support of the implied negative covenant against Pathe to refrain “ from forms of competition involving unfair diversion of royalties or profits (Cardozo, J., Underhill v. Schenck, 238 N. Y. 7, 13-14, supra.)
In McClintic v. Sheldon (supra) the plaintiff, under an agreement with defendant, had acquired exclusive rights to present a play written by defendant and also was given a 50% interest in “ ‘ all net profits and/or sums derived from ’ the sale or other disposition of motion picture rights (269 App. Div. 356, 358.) There was no question whatever of whether defendant had the right to exploit the motion picture rights. ' The sole issue in the McClintic v. Sheldon case was whether plaintiff was “ entitled to receive his proportionate share of the net funds recovered by defendants [from Metro-Groldwyn Pictures Corporation in an infringement action in the Federal court] for the unauthorized production of a motion picture of the play ”. (Idem, p. 359.) In reversing the lower court, the Appellate Division held that the plaintiff was entitled to his one-half share of the compensation required to be paid by M. G-. M., ‘ ‘ The infringer [who] was compelled to disgorge the profits directly traceable to the improper use of the motion picture rights belonging jointly to defendants and to plaintiff.”
The quotation taken from the lower court’s opinion in McClintic v. Sheldon (supra) which appears at the top of page 13 of the defendants’ memorandum, relates to an entirely different matter than is involved in our case, since the court was concerned with the question whether, in light of the terms of the contract between McClintic and Sheldon, a recovery by Sheldon for infringement of the motion picture rights should be treated the same as proceeds from a sale by Sheldon of the motion picture rights. Had there been a sale to M. Gr. M. instead of an appropriation by them there would have been no question whatever of plaintiff’s rights to his share, since exploitation of the movie rights and sharing of receipts therefrom was expressly provided for.
It is noted, however, that the Appellate Division, which reversed the lower court’s decision in McClintic v. Sheldon, on the ground that recovery for infringement of the movie rights should be treated as proceeds from the sale thereof, regarded the decision of the Court of Appeals in Kirke La Shelle Co. v. Armstrong Co. (263 N. Y. 79, supra [1933]) where the plaintiff who had a “ 50% interest in the dramatic rights to a play, exclusive of motion picture rights, was, nevertheless, entitled to share the proceeds received by defendants for the talking motion picture rights” as authority for allowing plaintiff, McClintic a 50% *319 interest in the recovery by defendant for unauthorized production of the motion picture because of the express agreement that McClintic was to have “ a 50% interest in all sums derived from motion picture rights ” (269 App. Div. 356, 361).
Defendants next rely on Judge Mantón’s opinion in Macloon v. Vitagraph (30 F. 2d 634 [2d Cir., 1929]) which is clearly distinguishable from this case and which was soundly distinguished by the Court of Appeals in Kirke La Shelle v. Armstrong Co. (supra). In the Macloon case, the denial of injunctive relief sought was squarely and expressly based on the fact that the defendant was a stranger to the contract under which plaintiffs acquired the play rights. The defendant was a bona fide purchaser of the movie rights who had invested a considerable sum without notice or knowledge of plaintiffs or plaintiffs’ rights. The Circuit Court recognized this crucial distinction by noting that in Manners v. Morosco and Harper Bros. v. Klaw (as in this case) the parties to the contract were the parties in the suit and ‘ ‘ the rights of bona fide purchasers for value without notice were not involved ” (30 F. 2d 634, 636). To further distinguish the Macloon case, this court refers to the learned opinion of Judge Httbbs, in the Kirke La Shelle case (supra) where the Court of Appeals stated (263 N. Y. 88-89): “ We are also referred to Macloon v. Vitagraph, Inc. (30 Fed. Rep. [2d] 634, 635), where the contract provided that a ‘ stock, motion picture and all other rights except the right of first class stage production limited to the territory above mentioned shall remain in the owner. ’ The action was not between the parties to the contract but between the assignee of the right of first class stage productions and purchasers from the other party to the contract, which was not recorded, of the right to produce the play in talking moving pictures. There the court refused to imply a negative covenant on the part of the grantor not to use the ungranted portion of the copyright estate to the detriment if not destruction of the licensed estate because the defendant was an innocent purchaser for value without notice and the contract expressly reserved to the grantor not only the motion picture rights but also all other rights.”
The reservation of “ all other rights ” in combination with a reservation of motion picture rights, as was true in the Macloon case, was construed to include the right to exploit the motion picture rights. The provision which appears in the Third Contract granting plaintiffs “ the right to distribute, exhibit and exploit the photoplays throughout the territory of the United States * * * except by means of television ” affords no possible basis for warranting exploitation of the ungranted *320 television rights to the detriment of the joint venture created by the Third Contract.
The only other decision cited by defendant, Tully v. Triangle Film Corp. (229 F. 297 [S. D. N. Y., 1916]) is similarly not in point. In the Tully case the question before the court was whether Espladion Producing Co., to which plaintiff Tully had granted the rights to produce and present a play based on Tally’s dramatic composition, had been misjoined as a party plaintiff with Tully in an action based on infringement by defendant of the rights in the dramatic composition by the production of a motion picture photoplay. It was the defendant who claimed Espladion had no status as a plaintiff, and in holding that there was a misjoinder, the court based its decision on the fact that the complaint itself disclosed that under the agreement in that case, plaintiff Tully, author of the dramatic composition, had granted Espladion the play rights but reserved “ all other rights of every name and nature in and to the said- dramatic composition unto himself, including the right to produce and present the same in motion picture photo play form ” (p. 298).
The court finds, from the testimony of Mr. Schneck, it was intended that the defendants could not use their television rights immediately after the execution of the Third Contract. The failure to ask did not impair the plaintiffs’ rights. The testimony failed to disclose that there had been prior television exploitation.
Mr. Schneck’s considerable experience and general knowledge in the motion picture industry establishes a logical reason why Mr. Schneck would not make further inquiry as to television exploitation. He had the right to reasonably assume Pathe would not undermine the joint venture entered into with him. The exploiting of 16 mm. rights, which it was alleged “to be detrimental to plaintiffs’ rights ” as contended by the defendants referred to “ domestic non-theatrical 16 mm. rights ”.
The defendants had no right to destroy the estate granted. It was not incumbent upon the plaintiffs to have inserted in any contract a specific covenant to obtain a grant of protection. With recognition of the fiduciary relationship involved and existing between the parties, the rule of the implied negative contract is even more exacting. This court does find that the defendants were charged with the negative duty of not interfering with the fruits of the joint adventure; that they did so was without regard to the rights of the plaintiffs. The question presents itself as to what reasonable time should have been afforded the plaintiffs to exploit the picture in the 35 mm. theatrical medium before the television competition should have *321 been permitted by the defendants. In this ease, the parties themselves had admeasured what constituted a reasonable time. Here the parties agreed that the venture should pay out of gross receipts and revenues, the sum of $300,000, within seven years from December 31, 1948. This was apparently taken as a reasonable time for the exploitation of the pictures involved. The court does not intend to substitute its judgment for the parties or to adopt any other rule of reasonable time.
Again, the proceeds of the television distribution were fast and it is not necessary for the court to make a reasonable time coextensive with the maturity of the note which was to be payable out of the proceeds of the venture. The proof shows that by May 14, 1951, the proceeds from the television exploitation of these very pictures were in excess of $255,000.
The court will now take the subject of the foreign territories wherein plaintiffs claim they were illegally blocked and interfered with (subd. B). The First Contract gave to the plaintiffs, in perpetuity, rights to exploit the motion pictures in “ all foreign countries and territories of the world ”, except where unexpired distribution agreements existed. The Second Contract gave the plaintiffs the right to exhibit the motion pictures in territory which “ shall consist of the entire world except as wherein expressly limited.” It is provided in both contracts that, before the Buyer shall undertake the distribution of any of the motion pictures in the aforesaid foreign countries or territories, he will consult with the Seller for the purpose of ascertaining those territories and foreign countries in which unexpired written agreements were in effect, and it was agreed that a list of said foreign countries and territories was to be prepared and signed by both parties to identify the same.
It was further agreed “ that upon the expiration of any presently unexpired written agreement in any foreign country or territory the Buyer shall have the right to reissue the motion pictures in such territory or foreign country, provided that the expired contract shall not restrict the same.”
Clearly, this is a grant of right to the plaintiffs in all the foreign countries of the world, except where legal restrictions existed which antedated the contracts themselves. The defendant did not reserve to itself the right to exploit those pictures in any foreign territory in competition with or in precedence of the plaintiffs. It did reserve specifically “ the right to license for exhibition or sale in the territory any or all motion pictures controlled by the Seller but not included in this agreement ” (First Contract, par. 21, incorporated by reference in Second Contract, par. 1).
*322 The court holds that if rights to a picture, photoplay or photo-plays expired under any of the particular agreements, the Seller did not reserve to itself the right to exploit those photo-plays within the territory. From the language of the contracts in evidence in this case, and as a matter of contract, the plaintiff Buyer obtained these rights immediately upon their release for use. To rule otherwise would have the Seller reserve to itself the right to exploit those photoplays within the territory. The Seller did not reserve to itself such a right and the language does not compel an abortive conclusion that it was intended that a hiatus would be created in which nobody would have the right. Plaintiffs’ Exhibits 78-84 establish proof that, in certain territories, the defendants themselves acknowledged that, where rights under an agreement terminated in advance of the expiration date of the contract, the plaintiff was given the rights immediately as a matter of contract, and not as a matter of grace.
In the Third Contract the Buyer was given the right to distribute the photoplays in any country or territory of the world “ except where bona fide unexpired distribution or exhibition agreements are now in effect and have been entered into before the date hereof by the Seller or any of its predecessors restricting such right of distribution, which agreements are noted by the Seller on Schedule B annexed hereto and made a part hereof.”
Schedule B specifically was to show “ the names of the photo-plays, the gauge of the photoplays covered, the present distributor or exhibitor for the territory, the date when such contract was entered into and the expiration date for the respective photoplays when there was a specific expiration date ”.
That contract further provided “ it is agreed that the Seller will notify the Buyer as soon as any photoplay becomes available for distribution by the Buyer in any particular territory by reason of the expiration of contract restrictions with respect thereto.” Paragraph 40 of the contract further clarifies the granting clause providing “ the Seller shall have the right to license for exhibition or sale in the territory any or all motion pictures controlled by the Seller but not included in this agreement or existing agreements heretofore entered into with the Buyer by the Seller.”
This restriction clearly evidences the fact that the Seller did not reserve the right to exploit any of the pictures included in plaintiff’s agreement in any of the foreign territories under any conditions. If rights expired in a particular territory, the Seller had specifically foregone its right to exploit thereupon. The intendment of the contract is clear that the purpose was to *323 give the Buyer the right to exploit whenever and wherever exploitation became legally available. The defendants argue that in the first two contracts plaintiff is given only rights of “reissue” upon the expiration of existing contracts; hence it could never have the right, where a contract was cancelled or terminated, to issue first run in the territory. In the Third Contract the word “ reissue ” was not used and it is clear, upon the face of the contract, that there was no such purported restriction. I find no point of distinction between the three contracts as all the motion pictures involved in the three contracts were “ reissue ” in the sense that they had had first run and subsequent runs in the United States and, in certain cases, in other territories prior to the making of the contracts. I construe the clause to mean that, not only reissue would be permitted to the plaintiffs upon the expiration of existing contracts but that, as to photoplays which had not been shown, the plaintiffs also had the right of exploitation where such pictures were not the subject of an existing contract previously made. Such holding is fortified by the form of the contracts offered in evidence which were unexpired, frequently requiring the existing contracting party to make selection of pictures by certain dates or otherwise to lose the right to the pictures enumerated. Thus, if 25 pictures were involved in a particular territory and the right of selection was exercised only as to 10, the remaining 15 would be free for exploitation by the plaintiffs. The course of conduct by the parties calls for the practical construction of the contract in relation to the motion pictures involved. The contention that the plaintiffs were never to have original rights in territories where, at the time of their contract, there were prior existing contracts with third parties, is negated by not only the contract but the dealings between the parties. This court holds that, if a motion picture became free of legal restriction, it was the plaintiffs’ to exploit if such picture was the subject matter of any of the contracts.
Much testimony and legal discussion embrace the question of the preparation and delivery of the list provided to be furnished pursuant to Paragraph 2 (B of the First and Second Contracts) and Paragraph 2B, 2C, and 2D of the Third Contract as herein before set forth.
Defendant contends that it has escaped responsibility for the failure to supply information which would have cleared the territory for the plaintiffs or for giving false or misleading information with respect to pictures involved in those territories, by asserting that the provision in the First and Second Contracts required that a list be prepared, that the matter was *324 a mutual one, and that the duty of the defendant to notify the plaintiffs was no greater than the duty of the plaintiffs to find out for themselves.
The pertinent clause of the contract reads: the Buyer ‘ will consult with the Seller for the purpose of ascertaining those territories or foreign countries in which unexpired written agreements are in effect.” The obvious fact is that the Buyer had no means of ascertaining the facts and that it would have to rely upon the Seller for the information. The contract further provided: “it is agreed that a list of said foreign countries and territories shall be prepared and signed by both parties hereto to identify the same.” Obviously, both parties could not prepare a list for the purpose of identifying the same if the information was wholly within the control of the defendant. It was incumbent upon the defendant to prepare the list and, if it was so prepared, to obtain the signature of the plaintiff “to identify the same”. The form of the list or lists was immaterial but the identification of the foreign countries and territories involved made it incumbent upon the defendant to prepare such a list and to obtain the signature of the plaintiff. The court holds that access to the information was wholly in the control of the defendant and that the failure to make the specific list or lists did not relieve the defendant of the duty to furnish accurate information.
It is implied in every contract that there is a duty of co-operation on the part of both parties. As was stated in Mansfield v. New York Central & H. R. R. R. Co. (102 N. Y. 205):
“ The plainest principles of justice require the implication, of a covenant, on the part of the defendant to prepare the foundations in question so as to have them in a condition to enable the contractors to prosecute their work to the utmost advantage and economy, before giving the notice which set the time limited for their completion in motion. Any other construction would destroy the mutuality of the agreement, and put it practically in the power of one party to defeat performance by the other.” (P. 212.)
“ There is no rule of construction or principle of law which will justify a party who is required by contract to give notice to another of the existence of a fact upon which important obligations depend, to do so untruly, or in such a manner as to prejudice the contractual rights and privileges of the party entitled to notice.” (P.211.)
Where a matter is particularly within the knowledge of one party, it is his duty to supply the information. An assertion that the other party should come and get it is not a sound doe *325 trine. The doctrine was succinctly stated in Weeks v. Rector of Trinity Church (56 App. Div. 195, 197 [1st Dept., 1900]) where the court laid down the rule: “ The rule of law is that when the obligation of performance by one party to a contract presupposes the doing of another act by the other party prior thereto, there arises an implied obligation of the second party to do the act which the performance of the contract necessarily involves.” (See, also, Genet v. Delaware & Hudson Canal Co., 136 N. Y. 593 [1893]; Wilson v. Mechanical Orguinette Co., 170 N. Y. 542 [1902]; Wigand v. Bachmann-Bechtel Brew. Co., 222 N. Y. 272 [1918].) The principle was restated by Judge Cardozo in Wood v. Duff-Gordon (222 N. Y. 88, 91 [1917]) in which he reiterated the principle that a contract ‘ ‘ instinct with an obligation imperfectly expressed will not deter from its validity.” (See, also, 5 Williston on Contracts, § 1293.)
The principle may be enunciated from the cases just cited that, when the supplying of information is a practical prerequisite to performance by a party to a contract, the duty to give the information will be implied, even though it is not expressed in the contract. I hold that it was the duty of the defendants to supply the information which would have cleared the territories. It is uncontroverted that the defendants and their agents had all the records which were required for furnishing such information, and that the plaintiffs had none. The existence or nonexistence of outstanding contracts between the defendants and third parties was not within the knowledge of the plaintiffs. Any suggestion by the defendants that the plaintiffs waived their right to the information in any degree is overruled. As a fact, upon the evidence, the court finds that the plaintiffs did all that they could do to elicit information from the defendants. It plied the defendants with requests for information with respect to the foreign territories and was met with delay and a lack of co-operation; there came a time when the plaintiffs received most of the requested information. That information is the further basis for complaint by these plaintiffs and will be discussed herein. The court finds that it was the duty of the defendants to give to the plaintiffs accurate and truthful information; the defendants were under a duty to notify the plaintiffs when territories opened up and were cleared; the court finds that this obligation by Pathe was not properly performed; the duty to notify the plaintiffs of the territories as they became available was one of good faith implied in the contract. Where the parties are dealing at arms’ length, neither party should frustrate the performance of the other, and similarly each party must co-operate to permit the other to obtain the full benefits of performance.
*326 As to foreign breaches, the plaintiffs have established to the satisfaction of the court that, where previously existing contracts expired, the defendant Pathe failed to notify Madison of the expiration of those contracts, which it was under a duty to do. Further, the defendants affirmatively misrepresented that the contracts prevented the exploitation of the rights that had been granted in those territories. In connection with the misrepresentations covering various territories in the world, affirmative representations were made by Pathe that various “litigations” or “lawsuits” prohibited the exploitation by Madison and its successors of the photoplays in those territories. It was represented that the lawsuits were of such nature as to tie up the product and prevent its exploitation. From the pleadings in evidence, all of the suits were at law for money damages. Theory of the litigations was that the contracts had been repudiated by the defendant Pathe, or its subsidiary, and the lawsuits were pursued in acceptance of the repudiation and a consequent suit for damages upon repudiation of the contracts. Mr. Schneck, plaintiff’s president, had been informed that the several territories were tied up in litigations; that he was blocked in those territories and could not exploit the pictures therein. Mr. Schneck was a credible witness and the evidence in the case supports his testimony. Further, it is noted that in much of the territory involved, aside from finding that there was a misrepresentation concerning the nature of the lawsuits, it is a fact that the contracts were terminated prior to the lawsuits or by the commencement of the lawsuits themselves. When such occurred, the territory should have been opened to the plaintiffs, and the defendants were under a duty to so notify the plaintiffs.
In view of the fact that findings of fact and conclusions of law are requested, and that an interlocutory judgment must follow the decision rendered herein, it is advisable for the court to particularize not only the claims, the territories, but the motion pictures that are involved in the respective claims, on each contract in each territory. It was a breach of duty on the part of the defendants not to clear the territory of Spain, Portugal, etc. I find the plaintiffs were informed and information furnished on May 14, 1946 that the territory of Spain and Portugal was not open to the plaintiffs because of an unexpired contract with one Ashad Ali Haji, covering that territory on the Group A pictures. Plaintiffs proved that on June 14, 1946, a month later, defendants repudiated the contract with Ashad Ali Haji, and took the position that his contract was over, and that its records would be marked accordingly. Whether or not *327 its records were so marked, it is indisputable that the plaintiffs were never notified of the termination of the Ali Haji contract. Similarly, with respect to the Group B pictures, plaintiffs were informed that a contract existed with Ashad Ali Haji, and so with respect to Group C pictures. Although, with information given with respect to the latter two contracts, there was also a notation that the contract was the subject of a lawsuit, it is nowhere revealed that the Ali Haji contract had been cancelled by the defendants on June 14, 1946.
In any event, a lawsuit was commenced by Ali Haji in this court on December 16,1947. At that time the repudiation by the defendants to Ali Haji was clearly accepted by him as a plaintiff in that action. There certainly can be no doubt that from December, 1947, on, no contract existed with Ali Haji.
Mr. Schneck testified that he was specifically told by officials of the defendants that Madison could not exploit the pictures under the various contracts in Spain and Portugal as the territory was blocked by pending lawsuits. The court finds that once the Ali Haji contract was terminated in the territory, the particular pictures involved became open to the plaintiffs under each of its respective contracts with the defendants, and that the territory should have been cleared forthwith.
With respect to the lawsuits, plaintiffs contend that by the statement that the contracts were the subject of a lawsuit, they were, in effect, told that the contract was still in existence. If it were true that the contract was still in existence and not affected by the lawsuit or the prior cancellation, plaintiffs would not be permitted to enter the territory. If, on the face of such information, apparently tendered in good faith, plaintiffs attempted to exercise its own judgment and enter the territory contrary to advice, it would have subjected itself to the possibility of having its own contract cancelled. It is clear that the exploitation by the plaintiffs of motion pictures not yet available to it would have constituted a material breach of contract. Where information is incorrect and misleading, the burden must fall upon the party giving the wrong information, and not upon the party who receives it; otherwise, every time a contract expresses or implies an obligation to give information, it would be incumbent upon the other party to play detective and determine the accuracy of the advice so given.
It is most significant that the defendant itself recognized that the contract with Ashad Ali Haji was no longer in existence, for it sold motion pictures involved in the very Ali Haji contract during the time when it was representing to plaintiffs that the contract was still in existence.
*328 The only excuse offered for this inconsistent position was given by the witness Seidelman, foreign manager of Eagle Lion Films, Inc., the wholly-owned subsidiary of Pathe, who said that, in so doing, he was taking a “ calculated risk ”. Although Seidelman indicated at first that he had sold a single picture for Spain as a “ calculated risk ”, it was developed upon cross-examination that there were several instances, over a period of time and in various territories, in which defendant pursued the same course of inconsistent conduct with the same excuse that it was a “ calculated risk”. This court was not favorably impressed with the explanations of Mr. Seidelman as to the “ calculated risks ” assumed by the defendant to justify its position as against the contentions of the plaintiffs. The testimony of Mr. Seidelman convinced the court that these “ calculated risks ” show nothing more or less than misrepresentations and a reluctance to clear or unblock territories to which the plaintiffs were entitled. This court will not look with favor upon a situation where the defendant, under a duty to clear the territory, made sales on its own account and, in effect, kept the other contracting party out of the territory.
The court, finds that the plaintiffs were illegally blocked in the territory of Spain, Portugal, Canary Islands, Ceuta, Chaferineas Islands, Melilla, Spanish Morocco, including Tangier, Spanish Guinea, and the following Portuguese possessions: Azores, Macau, Madeira Island, Portuguese East Africa, Portuguese West Africa, Portuguese Guinea, Portuguese India and Portuguese Timor, Balearic Islands, and the Cape Verde Islands.
As to the Group A motion pictures, plaintiffs were illegally blocked in the entire territory for all the motion pictures, namely, 41 Features and 35 Westerns, throughout the period shortly after the execution of the First Contract dated December 31, 1945 to the present time.
As to the Group B motion pictures, plaintiffs were illegally blocked as to all the motion pictures, namely, 40 Features and 34 Westerns, throughout the period shortly after the execution of the Second Gontraet dated November 22, 1947 to the present time.
As to the Group C motion pictures, plaintiffs were illegally blocked throughout the period from April 22,1949 to the present time as follows: As to all of the above countries, except Spain, plaintiffs were illegally blocked in all of the Group C motion pictures except Wife of Monte Cristo, namely 46 Features, 28 Westerns, and 4 Color Productions throughout the entire period mentioned above, with the exception of one Feature entitled Strange Holiday, as to which an illegal block ended *329 April 15, 1951, when the distribution rights relating to said motion picture expired.
Similarly, with respect to India, etc., a contract was entered into on November 13, 1942 with the same Ashad Ali Haji. The same letter of May 14, 1946 advised plaintiffs of that contract and indicated that selections were still to be made by Ali Haji. By letter of June 14, 1946, previously referred to, Ali Haji’s contract for India was cancelled at the same time as his contract for Spain and Portugal. All plaintiffs were told ultimately was that the contract was in litigation, and that plaintiffs were blocked from the territory.
In the territory of India, Burma, Ceylon, Afghanistan, Baluchistan, Bhutan and Nepal, as to the Group A motion pictures, plaintiffs were illegally blocked on 38 Features and 35 Westerns throughout the period shortly after the execution of the First Contract dated December 3, 1945, to the present date. There were legitimate blocks on three Features which made up the balance of the entire program.
As to the Group B motion pictures, plaintiffs were illegally blocked on the entire program, namely 40 Features and 34 Westerns, throughout the period shortly after the execution of the Second Contract dated November 22,1947 to the present time.
As to the Group C motion pictures, plaintiffs were illegally blocked on the entire program with the exception of Wife of Monte Cristo throughout the period from April 22, 1949, to the present date. The Wife of Monte Cristo was legitimately blocked to plaintiffs because of a prior distribution agreement, leaving plaintiffs illegally blocked as to 46 Features, 28 Westerns and 4 Color Productions.
In the Middle East there was a purported contract with Sodeco Trading Company dated December 8, 1943. Under the Sodeco contract, it was given an option (to be exercised by Aug. 30, 1944) to select features. In information sheets furnished to plaintiff, the defendant failed to mention the fact that there was a termination date before which the option had to be exercised. In furnishing this information the defendant accompanied it with a letter dated December 3, 1948 stating that it would like to call Madison’s attention “ to the fact that our contracts with Sodeco Trading Corporation covering 1942-43 and 1943-44 programs are now the subject of a lawsuit ”.
This was a misrepresentation of an existing fact. By December 3, 1948 there no longer existed a valid contract between Sodeco and defendant’s subsidiary, for the reason that all the pictures had not been selected from the program by April 8,1944, nor shipped by December 3, 1948, as provided therein. The *330 Sodeco contract was no valid contract against the plaintiff because it had expired as to all pictures in Group B except 14 pictures which had been selected and shipped according to the December 3, 1948 information furnished plaintiff before the Second Contract of November 22, 1947 between the plaintiff and the defendant was made.
Aside from the other reasons previously given which establish that the representation concerning the lawsuit was misleading, in the particular instance of the Sodeco' contract, it was misleading also for the reason that the December 4, 1943 contract referred to was not even in issue in the lawsuit brought by Sodeco Trading Corporation.
The court finds that the Federal court action of Sodeco Trading Corporation, plaintiff, against PRC Pictures, Inc., defendant, commenced on March 25,1946, was a suit based on a contract of July 20, 1945 and that it made no reference to the contract of December 8, 1943, which covered the particular pictures in the territory at issue here.
Therefore, in the territory of the Middle East, which consists of Egypt, Iran, Iraq, Syria, Anglo-Egyptian Sudan, Palestine and Turkey, I find as to the Group B motion pictures plaintiffs were illegally blocked on 19 Features and 28 Westerns throughout the period shortly after the execution of the Second Contract dated November 22, 1947 to April 14, 1952 when the territory was opened to plaintiffs. The balance of the program was legitimately blocked to plaintiffs.
As to the Group C motion pictures, plaintiffs were illegally blocked throughout the period from April 22, 1949 until April 14, 1952, when the territory was opened as follows: As to all of the above countries, except Palestine and Turkey, plaintiffs were illegally blocked on 28 Features, 25 Westerns and 4 Color Productions; with respect to Turkey, plaintiffs were illegally blocked on 37 Features, 28 Westerns, and 4 Color Productions; as to Palestine, plaintiffs were illegally blocked on 22 Features, 25 Westerns and 4 Color Productions.
In the case of the Far East, plaintiff was notified of a purported contract entered into with Union Export Company on July 21, 1945. Immediately thereafter, defendant’s agent notified Union Export Company that its contract was not acceptable. Despite this, the first information of May 14, 1946, although it indicated that the contract had not been serviced, stated that it was tied up in litigation. It was a litigation that commenced March, 1946. Significantly, plaintiff was never told that the contract had been rejected by the defendant at its incep *331 tion and that the Union Export Company had been told that it was not considered valid; nor when the plaintiff was informed of the litigation was it told that it was an acceptance of the repudiation and was merely a suit for money damages.
The Far East consists of China, Hong Kong, Formosa, Manchukuo and any additional territories to be obtained after World War II by China, Japan, Dutch East Indies, Java, Bali, Sumatra, Borneo, New Guinea, Celebes and the smaller Island, Singapore, Straits Settlements, British Controlled Malaya, Siam (Thailand).
The court finds that the information given by defendants was misleading on two scores: the alleged existence of a contract which did not exist and the statement that the lawsuit by Union Export Company prevented the exploitation of the territory of the Far East by plaintiff; that the defendant breached its duty to notify the plaintiff of the availability of the territory of the Far East; that it gave false and misleading information with respect thereto, and caused the plaintiff to be blocked from the territory which in fact should have been available to it.
I find in that territory as to the Group A motion pictures, plaintiffs were illegally blocked throughout the period from shortly after the execution of the First Contract, dated December 3, 1945, until April 14, 1952, when the territory was opened to plaintiffs as to all of the motion pictures, namely, 41 Features and 35 Westerns.
As to the Group B motion pictures, plaintiffs were illegally blocked throughout the period from shortly after the execution of the Second Contract, dated November 22, 1947 until April 14, 1952 when the territory was opened to plaintiffs as to all of the pictures, namely, 40 Features and 34 Westerns.
In addition to the foreign territories that fall into the so-called “ lawsuit ” category, this court finds that the plaintiffs were deprived of their rights to exploit motion pictures in certain foreign territories as a result of the defendants’ failure to notify plaintiffs of the cancellation of prior contracts (subd. C). The court finds, from the evidence, that information had been given to plaintiffs as part of Schedule B to the Third Contract that there was an existing agreement with Cobian Theaters, Inc., dated May 19, 1948, which tied up all of the motion pictures in the 1945-1946 program. The court finds that the Cobian Theaters contract of May 19,1948 had in fact been cancelled by an agreement between Cobian Theaters, Inc., and Eagle Lion Films, Inc., dated November 30, 1950, but no notice of said cancellation had been given plaintiffs and no clearance was furnished enabling *332 plaintiffs to exploit said motion pictures. Not only did the defendant fail to clear the territory to plaintiffs after the cancellation of the Cobian contract but in direct violation of plaintiffs’ exclusive rights defendant’s then Film Division, Eagle Lion Classics, Inc., entered into a contract with General Film Exchange, Inc., dated January 11, 1951, granting rights to two of the motion pictures in Group C, namely, Wife of Monte Cristo and Enchanted Forest. I hold that the plaintiffs were illegally blocked in the territory of Puerto Rico, Virgin Islands and Santo Domingo on 24 Features, 10 Westerns, and 4 Color Productions, in the Group C programs.
The territory of Trinidad, the Guineas, Barbados, St. Lucia, St. Vincent, Granada, Tobago, Antigua and Dominica was illegally blocked with respect to the Group C motion pictures which were the subject of a contract dated September 24, 1948 between Timothy Roodal and Eagle Lion Films, Inc., which had not been selected by April 1,1949 as proved under said contract.
I find that in the defendants’ failure to notify plaintiffs of the unavailability of all unselected pictures of the defendants did illegally block the plaintiffs on 34 Features, 28 Westerns and 4 Color Productions, all representing the pictures that had not been selected under the Roodal contract as it is established by Schedule B information forming part of the Third Contract, which reflects the motion pictures that had been selected prior to its preparation.
This court further finds that as to the territory of France, Belgium and Luxembourg the defendants through its subsidiary Eagle Lion Films, Inc., wrongfully deprived the plaintiffs of the right, to exploit. I find that information supplied regarding the Group A and the Group B motion pictures for the above territory to plaintiffs was made by letter dated December 7, 1948. This information furnished did not enable the plaintiffs to exploit even those motion pictures which had not been shipped because the schedules annexed to the aforesaid letter indicated that on the remaining pictures, selections had been made by the prior distributor, Near East Films.
By letter dated December 10, 1948 Eagle Lion Films, Inc., confirmed its authorization for plaintiffs to dispose of the Group A motion pictures not already shipped to France, Belgium and Luxembourg. These consisted of 29 Features, and 23 Westerns. Similar authorization should have been given to plaintiffs to dispose of the Group B motion pictures not already shipped, which consisted of 28 Features and 25 Westerns. On January 11, 1950 the. subsidiary of defendant Eagle Lion Films, Inc., rescinded the clearance which had been given to Group A *333 pictures by letter of December 10, 1948. There was no further clearance ever received as to Group A or Group B motion pictures.
I find the following facts (under subd. D): In reference to the territories of Puerto Rico, Virgin Islands and Santo Domingo: A letter agreement, dated January 11, 1951 between Eagle Lion Classics, Inc., and General Film Exchange, Inc., for Group C motion pictures (Enchanted Forest and Wife of Monte Cristo) were included in an agreement between those parties which was dated September 11, 1950. This sale was made subsequent to the time when plaintiffs should have had the rights to all Group C motion pictures in said territory, namely, November 30,1950, when the Cobian contract which had tied up the Group C pictures in question had been cancelled. Defendant Pathe’s wholly owned subsidiary, Eagle Lion Classics, Inc., was to receive 75% of the moneys earned by General Films Exchange, Inc., on the two motion pictures.
As to Australia, I find a contract dated January 1, 1950 was made by defendant Pathe’s wholly owned subsidiary, Eagle Lion Films, Inc., with National Films of N. S. W. granting rights to 20 motion pictures (4 from Group B and 16 from Group C) for the territory of Australia. This contract was made after plaintiffs had acquired the exclusive rights.
As to British West Africa, consisting of Nigeria, Sierra Leone and Gold Coast, I further find that a contract dated December 9, 1948, was made between defendant Pathe’s wholly owned subsidiary, Eagle Lion Films, Inc., and Baraland, Ltd., for the above territory. Included in the group of pictures covered by said contract was one Group B motion picture, Seven Doors to Death, for which a license fee of £45 was charged. Plaintiffs’ claim that defendants should be required to account to plaintiffs for their share of the moneys received from the Group B motion picture, sold after the plaintiffs had the exclusive rights, is allowed. The pictures covered by the agreement with Baraland under the package deal theory are not allowed.
As to England, I further find that a contract dated October 15, 1948 had been made with Meteor Films, Ltd. which granted rights in the motion picture called The Monster Maher, which is in Group B for the above territory long after plaintiffs had acquired the exclusive rights thereto.
I therefore conclude as to the four afore-mentioned territories to which plaintiffs had previously acquired all exclusive rights and as to which sales were made by defendants’ wholly owned subsidiaries that the defendant Pathe should be made to account for plaintiffs’ share of such moneys from the territories of *334 Puerto Eico, Virgin Islands, Santo Domingo, Australia, British West Africa, consisting of Nigeria, Sierra Leone and Gold Coast and England. I exclude any accounting as to the territory of British West Africa as to Group C pictures.
As to damages, involving these various issues, the court holds as to the first cause of action, that an accounting of the receipts derived by the defendants, or either of them, from the sales of prints or outright sales, shall be had as if they had been part of the joint venture.
In the second cause of action, involving the exploitation by television, this court will follow the rule laid down in Underhill v. Schench (supra); the measure of damages to be the receipts from the exploitation of the television rights by Wilton and its successors, to which should be applied the 40% of the joint venture which Madison or its successors had; but if such sum (which the defendants received for the sale of the television rights to Wilton) amounted to more than $102,500, the limit of the recovery by the plaintiffs would be $102,500. The plaintiffs established that the receipts from the television rights were well above $255,000, which amount, if added to the proceeds of the joint venture, would have yielded to plaintiffs more than $102,500 as its 40% share. Plaintiffs are entitled to recover the full sum of $102,500 and judgment will be entered accordingly.
With respect to the violations of foreign distribution rights in 35 mm., it is found that PRO Pictures,.Inc., Eagle Lion Films, Inc., and Eagle Lion Classics, Inc., were wholly owned subsidiaries of the defendant Pathe. The delegation by Pathe of its obligation of performance of the various portions of the contract, did not excuse it for any incorrect performance by its agents so delegated to perform. All performances were within the authority, or the apparent authority, of such agents and did not free Pathe from its liability. Any incorrect performance with respect to these contracts by Pathe designated agents made the defendant Pathe liable. (Davidson v. Madison Corp., 257 N. Y. 120 [1931]; Acetate Box Corp. v. Johnsen, 193 Misc. 54 [1948]; Restatement, Contracts, §§ 160, 162; 2 Williston on Contracts, § 411; 4 Corbin on Contracts, § 866.)
The rule of liability, and the basic rule of damages, was stated by the Court of Appeals in the Mansfield case (102 N. Y. 205, 211, supra): “ It is a well-settled principle of law in the construction of contracts that when the obligation of performance by one party presupposes the doing of some act on the part of the other prior thereto, that the neglect or refusal to perform such act not only dispenses with the obligation of performance by the other, but also entitles him to rescind, or when rescission *335 will not afford him an adequate remedy, to continue the work and recover such damages as the delinquency has occasioned, against the defaulting party. (Cross v. Beard, 26 N. Y. 85, 88.) ”
A substantial monetary recovery cannot be denied where damage has been sustained, and the only question is as to the extent of such pecuniary injury. In the leading case of Wakeman v. Wheeler & Wilson Mfg. Co. (101 N. Y. 205, 209-210 [1886]) the Court of Appeals held: ‘ when it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount, there can rarely be good reason for refusing, on account of such uncertainty, any damages whatever for the breach. A person violating his contract should not be permitted entirely to escape liability because the amount of the damages which he has caused is uncertain. It is not true that loss of profits cannot be allowed as damages for a breach of contract. Losses sustained and gains prevented are proper elements of damage.”
This proposition has been restated by the Supreme Court of the United States. That court in Bigelow v. RKO Radio Pictures (327 U. S. 251, 264-266 [1946]) in commenting upon the rule where damage has clearly been sustained and the defendant by his own wrong has prevented a more precise computation, said: ‘ ‘ Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain. Failure to apply it would mean that the more grievous the wrong done, the less likelihood there would be of a recovery. The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created. See Package Closure Corp. v. Sealright Co., 141 F. 2d 972, 979. That principle is an ancient one * ‘ The constant tendency of the courts is to find some way in which damages can be awarded where a wrong has been done. Difficulty of ascertainment is no longer confused with right of recovery ’ for a proven invasion of the plaintiff’s rights.” (See, also, Eastman Co. v. Southern Photo Co., 273 U. S. 359, 379 [1927].)
In Bigelow v. RKO Radio Pictures (supra) the certainty and measure of damages for the wrongful deprivation of the plaintiff movie exhibitor’s rights to bid “ in open competition against other exhibitors ” to obtain films which had not had a prior showing was an issue. Two damage theories were submitted to the jury: (1) a comparison of the earnings by plaintiff’s theatre during the period in question with those of a comparable *336 theatre of the defendant; and (2) a comparison of plaintiff’s receipts during the damage period with his receipts immediately preceding this period. The Supreme Court of the United States, in holding that the jury’s verdict for substantial monetary damages was not speculative, said: “ Each of the two classes of evidence introduced by petitioners tended to show damage * * * [The first theory tended to show] that petitioners’ receipts from its theatre were less by substantially the same amount than receipts of its competitor [the theatre owned by the defendant] ” (p. 260).
Thus the comparison with the receipts by the plaintiff and defendant has been recognized as a logical damage premise. In the instant case there is even a stronger basis for rational calculation than in the Bigelow case. Instead of a comparison of receipts derived from one theatre owned by defendants, as in the Bigelow case, the preferred rule of damages is based upon a comparison of a multitude of transactions by plaintiffs and Pathe in many foreign countries; furthermore, the rule of the Wakemcm, Bigelow and Eastman Kodak cases is not limited to situations where plaintiffs derived receipts in the relevant market prior to its exclusion by defendants’ wrongful conduct, if there is some rational index, or reasonable basis for computing damages.
In William Goldman Theatres v. Loew’s, Inc. (69 F. Supp. 103 [E. D., Pa.], affd. 164 F. 2d 1021 [3d Cir., 1948], cert, denied 334 U. S. 811; see, also, Theatre Inv. Co. v. RKO Radio Pictures, 72 F. Supp. 650 [W. D., Wash., 1947]), the plaintiff was wrongfully excluded from exhibiting first run motion pictures in its theatre. Plaintiff’s theatre had no record of past performance at the time of the wrongful exclusion. Plaintiff’s only evidence of damages was the receipts of other comparable theatres in the area. Plaintiff contended that the measure of his damages should be derived from a ratio based upon the dollar volume of business of the other theatres. That is, if there were five first run theatres in the area, including plaintiff’s, it should receive one fifth of the net proceeds of all the theatres as damages. The court (69 F. Supp. 103, supra) in awarding substantial damages held that “ the evidence offered by the plaintiff is sufficient to enable the Court to estimate the amount of probable profits with a reasonable degree of accuracy, which is all that the law requires ” (p. 108). The court followed the rule laid down in the Eastman Kodak case (supra, p. 379): “ It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate.”
*337 The rule of the Goldman case, that plaintiff need not have done business in the relevant market in order to recover damages based upon defendants’ wrongful conduct in that market, is also the law of New York. In Dad’s Root Beer Co. v. Doc’s Beverages (193 F. 2d 77, 82 [1951]) the Court of Appeals for the second circuit, applying the law of New York, held that a substantial monetary recovery was proper, even when no lost sales were shown, nor direct competition between plaintiff and defendant in the relevant market proven. The court rejected the contention “ that without direct competition in the same geographic area there can be no recovery of profits.” (P. 83.)
The defense advances the unique theory that damages for the blockings should be limited to 6% of the revenues made by plaintiff at a later time in the territories. If the right to damages exists, the deprivation of 94% of the damages sustained by the injured party during the particular period of blocking, or during temporary periods, appears most untenable. The defendants object to the rule of damages advanced by the plaintiffs, and bases its objections upon the case of Broadway Photoplay Co. v. World Film Corp. (225 N. Y. 104). Further objection is made to the rule or formula theory upon the purported differences and alleged inequities that would exist and arise in the application of the formula, because of the films, their nature, and the comparable business operations of the plaintiffs and defendants.
In the Broadway case, the defendant breached his contract to supply plaintiff with pictures, one day a week, for a year, for exhibition in the latter’s theatre. The plaintiff in a jury trial ‘ ‘ was permitted to prove its receipts from other pictures, supplied by other producers, before the breach and after ” (225 N. Y. 104, 107). The defendants’ brief emphasized the following statement, the crux of the court’s decision in that case: “ The task is hopeless here where only one day a week is covered by the contract. The plaintiff tries to avoid the difficulty by attributing to the defendant all the losses of the business from one week end to another. The fanciful theory is advanced that the public will flock to poor shows on six days of the week if there is a good show on the seventh. There can be no stable foundation for a verdict that is built on such assumptions.” (225 N. Y. 104, 109.)
The court went on to hold that “ In these circumstances, there was error in the denial of the defendant’s motion to strike out the evidence of the profits and losses of the [plaintiff’s] business.” (P. 109.)
The Broadway case upheld a particular formula based upon a comparison of receipts. The court cited the Wafcemam, case *338 at page 109 of its opinion, stating: “ The plaintiff was not required to prove its damages to the dollar (Wakeman v. Wheeler & Wilson Mfg. Co., 101 N. Y. 205).”
Subsequent to the decision in the Broadway case, the case of Brady v. Erlanger, sustained by the Appellate Division and affirmed by the Court of Appeals (188 App. Div. 728, 733 [1st Dept., 1919], affd. 231 N. Y. 563 [1921]) held that damages for loss of profits caused by the breach of an agreement to provide vaudeville performances was not speculative. It said (188 App. Div. 728, 733): “ Where the fact of loss is certain, the wrongdoer will not be heard to say that the innocent party shall be deprived of any and all recovery merely because the exact amount of damage cannot be fixed with precision. One who finds that the application of this rule to his particular case works a hardship has only his own wrongdoing to blame for his predicament. It is not necessary to distinguish the present case from those cited by the appellant. It is clear that we have here a reasonable basis of comparison and computation; an actual experience over a period sufficiently long to supply us with fair average results. Reasonable inference replaces guesswork. In other words, we have practically everything that was lacking in Broadway Photoplay Co. v. World Film Corporation (supra).”
To the extent that differences are advanced by the defendants against the application of a comparison formula, the Referee can, and will upon the taking of actual proof, determine and make allowances for differences or variances that the defendants seek to obtain, if they be proper against the formula.
. The court will follow the formulas laid down, in view of the wrong done the plaintiffs, to give to the plaintiffs an approximation of damages that would be fair under all of the circumstances of the case. The formula upon which the Referee shall calculate damages should properly relate to both of these situations:
(1) the receipts of the plaintiffs as compared with those of the defendants (or comparable competitors) in markets where both have done business (Bigelow v. RKO Radio Pictures, supra; Theatre Inv. Co. v. RKO Radio Pictures, supra) and
(2) the receipts of the defendants in market areas where plaintiffs have not done business, on the theory that defendants’ wrongful conduct, as here, effectively excluded plaintiff from these markets (William Goldman Theatres v. Loew’s Inc., supra; Dad’s Root Beer Co. v. Doc’s Beverages, supra).
The relative saleability in the territories can be determined by the fact that Pathe sold pictures, both in the territories freed to plaintiffs, and in the territories blocked to plaintiffs. The *339 ratio of Pathe’s sales in the blocked territories to its sales in the free territories establishes which pictures can be sold in the blocked territories. Once this ratio is determined, it applies to the sales made by plaintiffs in the free territories, to establish what plaintiffs would probably have sold in the blocked territories. Similarly, we can take the ratio of sales by plaintiffs, in the free territories, to sales by plaintiffs’ competitor, Pathe, in those same territories. Once this ratio is established, we can then apply it to Pathe’s actual experience in the blocked territories where plaintiffs were prevented from selling.
It will be obvious that the relative ability of plaintiffs to sell as against Pathe in the free territories should establish what their relative ability to sell against Pathe would have been in the blocked territories.
In respect to sales by Pictorial in foreign countries, the defendants are not to be held liable for distribution or sale, in those countries, for motion pictures not included in Group A, Group B or Group 0 contracts. Defendants cannot be held liable for the sale or distribution prior to December 3, 1945 of any Group A motion picture, prior to November 22, 1947 for any Group B motion picture, or prior to April 21, 1949 for any Group C motion picture in those foreign countries.
The interlocutory decree to be provided for herein will set down a basis for the computation of damages by the aforementioned formula in respect to these violations.
In respect to the cause of action seeking injunctive relief, this court in a separate and previously tried action determined the validity of certain assignments between the parties and decided that “ J. & J.” is the sole party liable on any promissory note held by defendant Pathe under the Third Contract (Madison Pictures v. Chesapeake Industries, 147 N. Y. S. 2d 50).
A $300,000 promissory note evidencing the purchase price was to be paid out of gross receipts derived under said Third Contract by December 31, 1955; whether the damages, as determined by a Referee, show an accrual to the joint venture to satisfy the full obligation, shall hereinafter be determined. Plaintiffs should receive 40% of the total revenue determined to have been lost as hereinbefore decided, such balance to be applied to reducing the note. If the note shall have been reduced to less than $65,000 by December 31, 1955, an additional three years is provided for under the agreement to pay said note.
In the event it is found by the Referee that the note was paid prior to December 31, 1955, the percentages according to the contract should be changed to 60% to the plaintiffs and 40% to the defendants. This application of the allowance of *340 percentages similarly applies to the Second Contract. In the event plaintiffs have overpaid the defendants larger sums than defendants were actually entitled to, plaintiffs shall have reimbursement therefor. »
It is obvious at this time, that the obligations existing under the Third Contract cannot be determined; it is equitable that the status quo of the parties be maintained until a final determination; the defendants will be enjoined and restrained from claiming a default, negotiating or transferring the note, repossessing any rights or claiming any deficiency or collecting on the note. In the event there be found to be due on said note a sum in excess of $65,000, an opportunity is to be decreed that shall enable the plaintiffs to exercise their option to reduce the note to $65,000, and 10 days shall be granted to plaintiffs after such final determination to exercise such option.
In conclusion, a final judgment in the sum of $102,500 is awarded to the plaintiff holding the assignment of the television claim. An interlocutory decree shall be entered by this court to determine the damages as herein provided and a Referee appointed to conduct an accounting, and to take proof and report on the damages to which plaintiffs are entitled by reason of the various breaches, violations and interferences with plaintiffs’ rights which have been held herein. The judgment shall further provide for injunction as herein indicated, and a cancellation of the note under the Third Contract, if same shall have been found to be paid. A stay of execution and time to settle a case on appeal is to be granted.
Submit findings, conclusions of law and proposed interlocutory judgment.