John D. Williams, Appellant, *v.* Maude Adams, Erlanger Productions, Inc., A. L. Erlanger Amusement Enterprises, Inc., Mitchell L. Erlanger, Saul J. Baron and Marcus Heiman, Respondents.

First Department, April 16, 1937.

*Arthur F. Driscoll* of counsel [*T. Newman Lawler* and *Benjamin Pepper* with him on the brief; *O'Brien, Driscoll & Raftery*, attorneys], for the appellant.

*R. Randolph Hicks* of counsel [*Lloyd F. Thanhouser* with him on the brief; *Satterlee & Canfield*, attorneys], for the respondent Maude Adams.

*Herman Hoffman*, for the respondents Erlanger Productions, Inc., A. L. Erlanger Amusement Enterprises, Inc., and Mitchell L. Erlanger.

*Aaron Lipper*, for the respondents Saul J. Baron and Marcus Heiman.

O'MALLEY, J. The complaint is predicated upon an implied contract on the part of all defendants to pay for services rendered by plaintiff at their request and solicitation between January 1, 1927, and September, 1931, and to recover the amount of alleged disbursements made. The reasonable value of the services was claimed to be $200,000; and the expenses and disbursements incurred the sum of $3,000. Judgment in the aggregate amount was sought.

Separate answers were interposed by the defendant Adams, by Erlanger Productions, Inc., by A. L. Erlanger Amusement Enterprises, Inc., Mitchell L. Erlanger, and by Saul J. Baron and Marcus Heiman, jointly. These put in issue generally the allegations of the complaint, and in addition, pleaded the Statute of Frauds, predicated upon the averment that the agreement was not to be performed within one year, and that neither it nor any memorandum thereof in writing was ever subscribed.

The defendant Maude Adams is the well-known American actress who played under the management of Charles Frohman from about 1890 until his death. In 1918 she retired, due to ill health.

The plaintiff has for many years been engaged in the theatrical business as a press man, publicity agent, stage director, author and producer. He, too, was with the Frohman organization, beginning about the year 1905 or 1906. He continued with it for about ten years in the capacity of publicity man, and as such handled all press work in connection with the plays in which the defendant Adams appeared. In addition to his regular press or publicity work, he attended to the business end of special per-

formances of plays given by Miss Adams at various universities. This extra work concededly was without the regular scope of his duties, and he was never specially compensated therefor.

During the time the plaintiff was thus employed, a rather close relationship and friendship developed between him and the defendant Adams. After her retirement she, at plaintiff's request, saw dress rehearsals and plays he was directing and she read and gave her opinion respecting a number of plays sent to her by the plaintiff. She also rendered assistance to another actress who played the part originally played by her in a revival of one of her plays which was being directed by the plaintiff. She neither sought nor received compensation for services thus rendered.

Early in 1927, Miss Adams, who was contemplating a return to public life, consulted with plaintiff. She owned the motion picture rights of Kipling's story " Kim," and desired to direct the motion picture herself. The plaintiff, however, after interviewing producers and parties who might be interested in financing the venture, discovered that producers did not favor the plan of Miss Adams directing the picture, preferring their own directors.

There was next discussed a lecture tour, and after numerous conferences with a manager experienced in this field (all arranged through the plaintiff's efforts), the matter progressed to a point where a contract was prepared and signed by the tour manager. The defendant Adams, however, did not sign the contract and the idea was abandoned.

Sometime in 1929 the defendant Adams informed plaintiff that she had an idea for a play, which, if satisfactory, might lead to her return to the legitimate stage. The proposition was considered and discussed over a period of months, and finally plaintiff's friend, John Colton, a well-known playwright, was consulted. The defendant Adams had read the manuscript of a Colton play and was favorably impressed. About May, 1930, plaintiff suggested that financial and other backing of some producer would be required. He thereupon interviewed first the Shuberts and then the Erlanger organization. Finally, the defendant Adams, on May 12, 1930, wrote to the defendant Mitchell L. Erlanger, then the head of the Erlanger organization, as follows:

" If you and I like the play I have spoken to you about, Mr. John Colton's comedy tentatively called ' The Joyous Adventures of Clementine,' it is my understanding that I am to come under your management, each of us having in mind the following:

" That you and I shall be quite satisfied with the play as finally submitted by Mr. Colton, and that it shall be submitted not later than September 1st, 1930.

"That it is agreeable to you that the selection of the cast, the stage director, the choice of scenery and properties for Mr. Colton's play shall have my approval   *   *   *.

"That the advertisements, announcements and press matter used in connection with my appearance shall be under the management or supervision of Mr. John D. Williams because of his familiarity with my usual policy.

"That the compensation I am to receive from you shall be as follows:

"16% of the gross weekly receipts up to $18,000, but for any week that totals $18,000 or over, then in lieu of the above I am to receive 20% of the gross receipts."

With the terms of this letter the plaintiff was thoroughly conversant. Indeed, it was he who, on May 14, 1930, personally delivered it to the defendant Erlanger, who accepted the terms as satisfactory.

Under date of May 16, 1930, the plaintiff himself entered into an agreement with the A. L. Erlanger Amusement Enterprises, Inc., as follows:

"This is to confirm our agreement regarding 'The Joyous Adventures of Clementine.'

"1. In consideration of your bringing to our offices the above play and Maude Adams as the star of said play, and in consideration of your agreement to direct and stage the said play and supervise the selection of the cast with Miss Adams, and the choice of scenery, costumes and so forth, we agree to pay you the following sums of money:   *   *   *

"3. Your share of the net profits are [is] to be paid to you monthly.   *   *   *

"4. You are to receive the usual weekly statements, showing the detailed operating cost, and any other cost incident to the presentation of said play, the gross receipts and so forth, including daily box-office statements.

"5. During the period of rehearsal you agree to be prompt and punctual at all rehearsals, and supervise and stage said play. During said rehearsal period you are to receive a salary of Five Hundred Dollars ($500) per week, and in addition thereto, as a royalty for staging and directing, and for working on the manuscript of the said play you are to receive One Hundred and Fifty Dollars ($150) per week each and every week during the run of the said play. As an advance against expenses we agree to advance you the sum of Two Thousand Dollars ($2,000) to be used by you for your expenses in going to California to work with Miss Adams and John Colton on the manuscript of said play.

" 6. In all newspaper publicity under our control and on the programs in theatres, and in other announcements pertaining to said play, you are to receive the following credit, to wit:

" ' Staged or Directed by John D. Williams.'

" 7. It is understood and agreed that we are to advance all monies necessary for the production of said play and that your interest is only in the profits, and not in the losses or production costs, excepting, however, that we shall recoup our production cost before paying you any profits.

" Your acceptance at the bottom hereof shall be deemed a valid and binding agreement between us."

Of course, under these writings, the plaintiff clearly had no claim against the defendant Adams, or any other defendant, save the A. L. Erlanger Amusement Enterprises, Inc. Indeed, he himself testified that when the defendant Adams asked him what his arrangements in the matter were, he informed her he did not think that it concerned her as he was to get his profits from Erlanger.

The plaintiff had previously testified that when he was summoned in the first instance by the defendant Adams, she expressed a desire to make up for what they had done in the past together, and that there should be a profit for both of them in any new venture.

Miss Adams testified without contradiction from the plaintiff in rebuttal, that she had asked the plaintiff what financial arrangements he wanted, and was told that he desired none with her, but would have all his arrangements with the management.

The plaintiff further testified that this agreement of May, 1930, was the only written contract he had and it was the one upon which he relied. Eventually, the form of the Colton play did not prove satisfactory to the defendant Adams and this venture was also abandoned.

Between April and June, 1931, however, Miss Adams discussed with the plaintiff the substitution of " The Merchant of Venice " as the vehicle for her return to the stage. The proposition was submitted to the defendant Erlanger and approved by him. The plaintiff testified that so far as he and the defendant Adams were concerned, he was continuing under the Erlanger contract. Further, when interrogated by Miss Adams as to its terms, he told her that his contract was with them and was for twenty-five per cent of the net profits; that it had nothing to do with her own arrangements. His brother testified to the same effect.

When consulting the defendant Erlanger, Miss Adams learned for the first time that inconsistent with her own agreement, the plaintiff under his written contract was not only supervising the

handling of the publicity matter, but was put in charge of the production as a general director. Miss Adams then insisted upon the right to name her own director under her contract and so notified the defendant Erlanger. The latter thereupon offered the plaintiff the position of publicity director of the substituted play at a salary of $300 per week. Plaintiff refused this offer and had nothing further to do with the production of " The Merchant of Venice." Plaintiff admitted that under this offer any compensation to which he would be entitled would be paid by the Erlangers and not by Miss Adams.

Prior to the commencement of this action the plaintiff made no demand upon Miss Adams and never intimated in all his dealings with her that he expected to be compensated for his services. He kept no account of the amount of time or money spent by him, nor could he allocate to the various items of work any particular value. His own estimate of the value of his services was the only evidence offered.

In the circumstances disclosed we are of the opinion that the plaintiff entirely failed to make out a case for recovery against the defendant Adams upon any theory of implied contract. From his own testimony and that of Miss Adams (uncontradicted), the plaintiff did not desire any financial arrangement with her, but intended and did look to the producer for remuneration. An implied promise on the part of the defendant Adams to compensate the plaintiff may not, we think, be predicated upon these facts. (*Walton Water Co.* v. *Village of Walton*, 238 N. Y. 46, 52; *Miller* v. *Schloss*, 218 id. 400, 406, 407; *Davidson* v. *Westchester Gas-Light Co.*, 99 id. 558, 566, 567.)

Nor may recovery against her be sustained, as now urged in the brief of plaintiff's counsel, upon the theory that she was guilty of preventing plaintiff from obtaining his compensation from the producers. The plaintiff, before procuring his own written agreement, knew the terms of plaintiff's contract, whereby he was put in charge of publicity merely, and was not to direct. The defendant Adams, therefore, was well within her rights when she refused to consent to plaintiff acting as director. In addition, the complaint and bill of particulars were based upon the theory of implied contract. It was upon this theory that the case was tried and submitted to the jury. The plaintiff may not, therefore, sustain the verdict in his favor upon the theory of tortious interference with his contract rights, rather than upon the theory of implied contract. (*Rosenzweig* v. *Schmitt*, 232 App. Div. 131.)

We are further of the opinion that the complaint was properly dismissed as to the other defendants. With respect to the defend-

ants Baron and Heiman, the plaintiff admitted that he knew the former was attorney for the Erlanger corporation and that any dealings he had with him were in such capacity. So, too, he admitted he knew that Heiman was one of the board of managers of the Erlanger concern and that he dealt with him as an agent or officer. Concededly, he had no written contract with him.

Since the plaintiff knew that these two defendants were acting merely on behalf of the corporate defendants, they incurred no liability to compensate him for services either upon an express or an implied contract. He admitted that he had never spoken to either Baron or Heiman in connection with " The Merchant of Venice."

It is to be noted that while the plaintiff is suing for services commencing as early as the year 1927, he did not meet any of the defendants, other than Adams, prior to 1930. He admitted that none of the defendants knew of the contemplated motion picture, or the lecture tour. Moreover, it seems to have been conceded upon the trial that the plaintiff was not claiming against the defendants other than Adams for any services rendered for either of these proposed ventures.

There remains to be considered the question of the liability, if any, of the individual defendant Erlanger and the corporate defendants Erlanger Productions, Inc., and A. L. Erlanger Amusement Enterprises, Inc., by reason of alleged services rendered by the plaintiff after the written agreement of May 16, 1930. It is to be observed that the agreement pursuant to which " The Merchant of Venice " was to be produced was between Miss Adams and the Erlanger Productions, Inc., a corporation which had not been formed on May 16, 1930. The plaintiff, however, as already noted, seeks to recover against these two corporate defendants and the individual defendant Erlanger upon the theory of implied contract to pay for whatever services he rendered subsequent to the execution of the written agreement.

As already appears, Miss Adams under her agreement was within her rights in disapproving of the Colton play; and the plaintiff upon the trial conceded that the defendants Erlanger were bound by her decision. These defendants and the defendant Adams were thereafter, it seems to us, justified in making a further agreement between themselves. However, as already appears, and in a spirit of fairness to the plaintiff, he was offered the position of publicity agent at a stipulated salary of $300 a week. This was certainly as much as, if not more than, he was entitled to expect.

He refused this offer and the production of the substituted play proceeded without his co-operation or without his rendering any services.

In our view the situation here presented was one wherein the services rendered by the plaintiff were for the mutual benefit of all parties concerned. It has been held where services are thus performed the law will not imply a promise to reimburse. (*Davidson* v. *Westchester Gas-Light Co.*, *supra; Knudtsen* v. *Remmel*, 141 App. Div. 445, 449.)

It follows, therefore, that the judgment and order appealed from should be affirmed, with costs.

MARTIN, P. J., DORE and COHN, JJ., concur.

Judgment and order, so far as appealed from, unanimously affirmed, with costs.