**ARNOLD PRODUCTIONS, INC.,**
Plaintiff,

v.

**FAVORITE FILMS CORP. and Nation-
wide Television Corp., Defendants.**

United States District Court
S. D. New York.

Sept. 29, 1959.

Gainsburg, Gottlieb, Levitan & Cole, New York City, Samuel Gottlieb, New York City, of counsel, for plaintiff.

Fitelson & Mayers, New York City, Harold J. Sherman and Howard Gotbetter, New York City, of counsel, for defendant, Favorite Films Corp.

Winfield E. Aronberg, New York City, for defendant Nationwide Television Corp.

THOMAS F. MURPHY, District Judge.

This is a diversity action by the owner of two motion pictures against two distributors, Favorite Films Corporation (hereinafter called Favorite), to whom it had granted the exclusive right to exploit the pictures in theaters and on television throughout the United States and Canada, and against Nationwide Television Corporation (hereinafter called Nationwide), whom Favorite sublicensed as its exclusive agent for the television exploitation of the films. The pictures in suit are reissues entitled, It Happened Tomorrow and Hangmen Also Die.

The complaint alleges that Favorite breached its contract in that (1) it failed to use its best efforts in the television exploitation of the films; (2) it failed to keep and maintain books relating thereto for plaintiff's inspection; (3) it breached the covenant against assignment. There is further alleged a conspiracy between Favorite and Nationwide to cheat and defraud plaintiff of its share of the proceeds from the television distribution of the pictures. No complaint is made with respect to the theater distribution of the films by Favorite.

Defendants deny the allegations and in addition, Favorite claims that plaintiff has waived any and all such breaches by its acceptance and retention of remittances sent to it by Favorite together with each monthly statement, both before and subsequent to the institution of this suit, and after it had been fully apprised of the facts complained of herein.

The contract between plaintiff and Favorite became effective on June 1, 1947 and provided that Favorite as licensee was to have the sole and exclusive right to reproduce, lease, license, sub-license, exhibit, rent, distribute and exploit the two photo-plays, for a period of seven years throughout the United States and Canada in theatrical and television markets. Favorite agreed "to use its best efforts diligently and in good faith to exploit the said photoplays and to obtain as wide a distribution thereof and as many exhibitions and bookings thereof as possible." Favorite also agreed to "keep at its place of business in New York City, full and correct books of account with respect to the gross receipts derived from said photoplays, and * * * to permit the licensor * * * the right of access to and inspection of such * * * books".

The license was personal and non-assignable without the consent in writing of the licensor, and was to be interpreted and governed by the law of the state of New York. Plaintiff retained the right to elect to terminate the license in the event of a breach of any of the conditions on the part of Favorite, and in such event to retake with or without legal process any and all property concerning the pictures, and to collect any and all monies due or to become due to the licensee from their exploitation. Plaintiff's share was to be 37½% of the gross proceeds and Favorite's 62½%.

On March 14, 1949, Favorite and Nationwide entered into an agreement whereunder Nationwide became the former's "sole and exclusive agent for the marketing and booking" of the two pictures on television, upon terms and conditions similar to those contained in the plaintiff-Favorite contract including a similar "best efforts" clause, except that the Nationwide license was limited to

television distribution. Also, there were substantially identical provisions relating to the keeping and inspection of books; the personal nature and non-assignability of the license; the application of New York law, and the retention of the right to terminate the agreement with the same rights of repossession and collection of proceeds.

At the time of the negotiations between plaintiff's representative and Favorite, plaintiff was informed that Favorite was engaged in commercially exploiting and distributing re-issue motion pictures through the media of sub-licensees and sub-distributors, known as franchise holders, and that Favorite had some 30 such franchise holders throughout the United States and Canada. In fact it was through this network of agents that Favorite was expected to accomplish a wide distribution of the pictures, and moreover, accounted for its substantial share of the proceeds.

As we noted earlier, there is no complaint made here with respect to the theater distribution phase of Favorite's performance, and presumably, Favorite did utilize its network of franchise holders for that exploitation. The claim here relates to the television distribution, and more particularly with regard to the method of such distribution employed by Nationwide and, as alleged by plaintiff, Favorite's abandonment of that phase of exploitation to Nationwide which amounted in legal effect, it says to an assignment in disregard of the contractual prohibition against assignment.

The legal responsibility for the television exploitation would appear to be complicated somewhat further by the fact that Nationwide in turn, orally subleased the television distribution of these pictures to a subsidiary corporation, now dissolved, called Film Equities Corp. which apparently came into existence in early 1949. Film Equities was dissolved in March 1951 just prior to the institution of this suit, and was succeeded in the handling of plaintiff's films by another subsidiary of Nationwide, to wit, Unity, Inc., which was born almost simultaneously with the demise of Film Equities. These latter two entities each accounted directly to Favorite for its exploitation of the pictures retaining 25% of the proceeds, Nationwide receiving no part of the proceeds according to it. However, the evidence is clear that all three, Nationwide, Film Equities and Unity were owned by the same stockholders, had the same officers and occupied the same offices with the same personnel. We will treat them as one and the same legal entity for the purposes of this case.

We should dispose at the outset of the claim of conspiracy to defraud alleged to have existed between Nationwide and Favorite. Plaintiff has failed completely to support that claim. It has offered no evidence whatever to substantiate it and, accordingly, will be dismissed from further consideration.

 Plaintiff's case rests upon the theory that the method of television distribution employed by Nationwide did not amount to the exercise of best efforts diligently to exploit the pictures on T.V., but on the contrary, was a breach of that obligation. In other words, Nationwide's failure in that respect would be Favorite's failure of its same obligation to plaintiff. We consider Nationwide, in the terminology under which it entered into the agreement with Favorite, as mere agent for the latter for the purpose of fulfilling part of Favorite's contract obligations to plaintiff. Similarly, the performance of Nationwide's subsidiaries would be Nationwide's performance, if not in fact, then on general equitable and agency principles. Cf. *Madison Pictures, Inc. v. Pictorial Films, Inc.*, 6 Misc.2d 302, 151 N.Y.S.2d 95, 105, 126–127. We will consider, as a practical matter, all of them as one when weighing the issue of "best efforts", and merely refer to defendant's performance in that regard.

Defendant marketed the pictures along with a group of other films in a "package" or "library" deal whereunder the T.V. station-buyer was given its choice to select from the group it leased, any

picture it cared to exhibit; to play a picture as often as it cared to, during a stated contract term; and pay for the package, one lump sum, payable over the course of the contract, apparently averaging 12 to 18 months. If any picture in a group was not shown by the station owner, it was credited with no part of the lump sum. Those that were played were credited as follows: The total number of hours of television exhibition from that group was divided into the lump sum, and the quotient equalled the amount per hour to be apportioned to each picture for each hour that it was shown. Each "feature" was counted as one hour in length.

It did not appear that plaintiff's pictures failed to be exhibited under any contract, but we gather that they were usually shown one to three times during the course of any contract term. That is readily and practically understandable. Whatever the rental price there is a limit to the number of times the average film can be televised in a given area within a stated period.

Plaintiff does not say its pictures would have been played more often if marketed by defendant separately or other than in package deals, nor does plaintiff say defendant failed to widely distribute the pictures on T.V. Its principal complaint is that more money should have been obtained by a different method of selling. To prove this and its damages plaintiff relied upon the testimony of its expert witness who testified that he entered the T.V. field of motion picture distribution in the latter part of 1949 when it was becoming commercially profitable, and that he is familiar with the prices in all markets and with the customers who buy for T.V. exhibition. He classified the pictures in suit as "A" pictures or top film fare, solely on the basis of their cast, though he had not seen either of them except for a short time many years ago. Referring to an exhibit in evidence which is a typical example of the type of library or package deal negotiated by defendant, this witness was of the opinion that it was unfair to sell a "very decent group of 14 feature films" contained therein, including the plaintiff's two pictures, with "short subjects" also in the group. He said that "to have sold the 14 features by themselves as I had to do, would have brought more money". In his opinion library deals were not for the best interests of the pictures, and, that more money could be obtained if they were sold individually. Favorite's expert was of the opinion that package sales was the most profitable way to sell motion pictures for television exhibition. Besides cast, which to plaintiff's expert was the sole criterion, this witness stressed the ratings given to pictures, and specially published, to determine their salability. Other important factors he considered were whether or not the picture has been exhibited before in the particular T.V. market, its age and its theatrical success (the uncontradicted testimony was that plaintiff's pictures were both financially unsuccessful). Without analogizing in these respects, but merely alluding to the similarity of equally popular casts, plaintiff's expert testified that he has sold individually, pictures comparable to plaintiff's in 1953, and procured such widely divergent prices as $3,000, $1,000, $700 and $300 per picture on terms allowing the station owner to play each picture four times in a period of 18 months.

Assuming that exploiting plaintiff's pictures in the manner defendant did constituted a breach of its agreement to exercise its best efforts, and accepting plaintiff's expert witness' testimony with respect to the amounts he received as stated above, we find that plaintiff nonetheless has failed to prove its damages with any possible degree of certainty, nor did the proof provide any reasonable basis of computation. There was presented to us just no way of ascertaining whether or not plaintiff's pictures would have brought more if sold individually and if so, how much. On the figures given us by plaintiff's expert we are left to speculate in a range anywhere from $300 to $3,000.

This case is not comparable to two recent decisions in this circuit (Shapiro, Bernstein & Co., Inc. v. Remington Records, Inc., 2 Cir., 265 F.2d 263; Deering, Milliken & Co., Inc. v. Gilbert, 2 Cir., 269 F.2d 191), wherein the defendants' tortious conduct, by its very nature, prevented the accurate ascertainment of the respective plaintiff's damages, which were undoubtedly sustained. See also Madison Pictures, Inc. v. Pictorial Films, supra, 151 N.Y.S.2d at pages 127, 128.

Here defendant performed under its contract and the complaint relates to the quality of that performance. Defendant has not prevented plaintiff from proving that it suffered damages, viz., the profits it could have grossed if defendant exploited the pictures as plaintiff says it should have. Plaintiff has simply not carried its burden.

■ Favorite had the contractual right to sub-license others for the exploitation of these pictures. It is fair to infer that Favorite sub-licensed some of its franchise holders for the theatrical distribution. It might have sub-licensed one or all of them for television distribution as well. It chose Nationwide as its exclusive agent for that purpose. The language employed in the Favorite-Nationwide agreement and the obligation of Nationwide to account to Favorite are not consistent with assignment. We hold that an assignment was not here proved. Nor did plaintiff satisfy its allegation of abandonment. In other words, we find that Favorite did not breach its agreement with plaintiff by its arrangement with Nationwide and that it was no more than a sub-agency, albeit an exclusive one, and within its contractual authority. It should be noted that Favorite exploited the pictures on T.V. through at least one other company (Telecast Corp.) for some 21 months before engaging Nationwide. The total T.V. income therefrom was $2,825. There does not appear to be any complaint with respect to Favorite's handling of these pictures during that period of time. From March 1949 when Nationwide took over, until July 1951 when this suit was filed, about 27 months, the total T.V. income was about $15,000. Merely from the figures quoted it would seem that Favorite had exercised good business judgment in engaging Nationwide. However, there has been some testimony to the effect that the television exhibition of motion pictures as a commercially profitable business, was only in its infancy between 1947–1949; that in the latter part of 1949 it just began to be lucrative.

■ There was no express provision in the agreement that Favorite was to license the pictures for T.V. exhibition separate and distinct from other motion pictures (Cf. Hart v. United Artists Corporation, 252 App.Div. 133, 298 N.Y.S. 1), nor has it been claimed that such a provision is implicit in the agreement. The exploitation of plaintiff's pictures in conjunction with others therefore was not of itself a breach of contract.

According to the testimony of Nationwide's secretary, all of the major distributors were selling pictures in the same package manner as Nationwide during the times in issue, and such was the most profitable way to market them. It appeared that plaintiff's expert handled between 30 and 40 films; Favorite's expert had a catalogue of about 140 pictures, and Nationwide's catalogue was still larger.

■ Concededly, plaintiff's expert did not handle large groups of pictures, nor did he know how to handle them. It may be that an industrious individual salesman, as he represented himself to be, could efficiently distribute single or small groups of pictures and secure higher prices for his wares than a firm like Nationwide, but we must analogize only with comparable companies or individuals. In ascertaining best efforts we would have to compare defendant's performance with the average, prudent comparable distributor in the T.V. market. A comparison of defendant's perform-

ance with that of the comparatively small scale operations of plaintiff's expert would not be valid. Defendant's expert testimony supports the manner and method utilized by it in marketing its catalogue of films in the television field, and, in effect, constitutes an endorsement of the package method as consistent with best efforts. We must either accept the testimony of defendant or consider that of plaintiff's expert as inapposite. In either case we are unable to find a failure to exercise best efforts under the circumstances.

■ The evidence allows a finding that Favorite in respect to T.V. distribution (and Nationwide, through Film Equities destruction of its books upon dissolution) breached the agreement with regard to the obligation to keep and maintain books for plaintiff's inspection. The books that were available were audited by plaintiff's accountant and no evidence relating thereto was introduced. While such a breach would perhaps entitle plaintiff to terminate the contract, that has long since become a moot remedy, and since plaintiff has made no attempt whatever to show damage flowing from this breach, none may be awarded.

■ Actually, plaintiff in its brief after trial points out that the contract has now expired and the films have been recaptured. It nevertheless is entitled to an accounting for all monies earned from the licensing of the films from the date of the last accounting.

Holding as we must that plaintiff has failed to sustain its burden, and that the complaint must be dismissed, except as to an accounting as above ordered, it is unnecessary to consider the question of waiver.

Judgment for defendants but without costs on all issues, except that relating to an accounting, and judgment for plaintiff directing defendants to account.

The above opinion is in lieu of findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A.