Bill ROBBINS, Plaintiff,

v.

OGDEN CORPORATION, Ogden Transportation Inc., Ogden Marine Inc. and Ogden Marine Drilling, Inc., Defendants.

No. 77 Civ. 40 (WCC).

United States District Court, S. D. New York.

April 28, 1980.

Daniel J. Kornstein, New York City, for plaintiff; Stewart L. Levy, New York City, of counsel.

Guggenheimer & Untermyer, New York City, for defendants; Robert E. Smith, Alan I. Raylesberg, New York City, of counsel.

## OPINION AND ORDER

CONNER, District Judge:

This action concerns an aborted venture by plaintiff Bill Robbins ("Robbins"), a resident of Texas, and defendants, a group of related Ogden Corporations including Ogden Transport, Inc. ("OTI"), Ogden Marine, Inc. ("OMI"), and Ogden Marine Drilling, Inc. ("OMDI") (collectively referred to as defendants)[1] to engage in the business of chartering oil drillships through defendant OMDI. Jurisdiction is premised upon diversity, 28 U.S.C. § 1332. Defendants move for summary judgment pursuant to Rule 56, F.R.Civ.P., on all nine counts of the amended complaint; plaintiff cross-moves for summary judgment on defendants' first two counterclaims.

The following facts—undisputed, except as noted—are established by affidavits, deposition testimony or responses to interrogatories: Plaintiff has been involved in the oil drilling business for many years. In 1973, he placed an order with a supplier for the basic components of two drilling rigs (the "drill packs") suitable for use in con-

---

1. Although all of the defendants were not directly involved in the oil drilling venture, for purposes of simplicity the parties have referred to all the defendants collectively and for purposes of the motions, the Court will do the same.

verting cargo vessels into drillships. The order ensured Robbins of a certain position on the production waiting list for the drill packs, equipment which required very long lead time for production and which was in great demand. In late 1973, Robbins entered into negotiations with a group of Norwegian investors for the purpose of organizing an offshore drilling venture wherein Robbins would supply his expertise in the oil industry and the Norwegians would contribute the capital required to purchase the vessels and to convert them into drillships by utilizing the drill packs. To this end, Robbins contacted Avondale Shipyards, Inc. ("Avondale"), an affiliate of OMI, which owned two older cargo ships suitable for conversion to drillships, to determine whether the cargo ships were for sale. Robbins alleges that a representative of the Ogden Corporation granted him an oral option to purchase the two vessels for a set price by June 1, 1974 in consideration for Robbins' promise either to try to sell the vessels to a third party or to utilize them in his proposed business arrangement with the Norwegians. Shortly thereafter, defendants asked Robbins to enter into an arrangement with them along the same lines as his proposed arrangement with the Norwegian investors. Robbins accepted defendants' offer and on May 30, 1974, Robbins and the defendants executed an "Agreement of Intent" wherein they expressed their "desire to explore the possibility of establishing a corporation (the 'Drilling Company') to engage in the drilling of offshore oil wells and the ownerships of drillships." The Agreement of Intent defined each party's role in the Drilling Company: defendants were to supply the capital for the purchase of the drill packs and to "make available and convert vessels into drillships," and plaintiff was to provide "the management and expertise necessary to ensure (a) the timely delivery of equipment [and (b)] staffing, organization, and efficient operation of the Drilling Company." The effectiveness of the Agreement of Intent was made contingent upon "(a) the parties finalizing an Agreement detailing the rights to which [Robbins] will be entitled after the incorporation of the Drilling Company and (b) the incorporation of the Drilling Company." If those two conditions were not met prior to September 1, 1974, the Agreement of Intent would terminate

> "with no obligations or liabilities by either party to the other, except . . . [i]n such event [defendants] will be entitled to resell any equipment purchased for use by the contemplated Drilling Company . . . [and Robbins] will commit [his] best efforts to assist in obtaining a purchaser."

Following execution of the Agreement of Intent, the parties sent two telex messages to the Norwegian investors; the first informed the Norwegians that Robbins was terminating his negotiations with them and the second stated that defendants were no longer interested in selling their vessels.

OMDI was incorporated in July of 1974. In August of 1974, an OMDI office was established in Houston, Texas and Robbins began to engage in various activities on behalf of OMDI in an effort to make the proposed agreement a success. Although no formal agreement was executed by September, the parties agreed not to terminate the Agreement of Intent and sometime in late 1974 or early 1975, they signed an agreement dated November 1, 1974 (the "Drilling Agreement"). That Agreement provided, *inter alia*, that defendants would (1) arrange to convert the vessels into drillships; (2) transfer the renovated vessels to OMDI in exchange for 80% of OMDI's outstanding common stock and 100% of its preferred stock; (3) cause OMDI to issue to plaintiff 20% of its outstanding common stock (15% to Robbins and 5% to two other key OMDI personnel) for $250,000 in cash; and (4) "use [their] best efforts to assist [OMDI] in arranging for charters and financing with responsible parties and [would] advise the Bill Robbins Group of the status of the negotiations from time to time . . .," Drilling Agreement at ¶ 6a (the "best efforts clause").

Paragraph 17 of the Drilling Agreement, however, stated that:

"Notwithstanding any other provisions hereof this Agreement shall not become effective unless [OMDI] enters into a Charter [the "initial charter"] for the Vessels in form and in substance acceptable to the Board of Directors of Ogden Corporation (the 'Effective Date')."

At about the same time that the Drilling Agreement was signed, the parties entered into another written agreement (the "Employment Agreement") in which defendants agreed to employ Robbins in a managerial and executive capacity in connection with the operation of OMDI and agreed to pay him a minimum salary of $50,000 per annum. The Employment Agreement provided that it was to commence on the "Effective Date," as that term was defined in the Drilling Agreement.

Although both parties solicited numerous potential charterers on behalf of OMDI, no charter was ever obtained for the two vessels. In June of 1975, defendants concluded that charters might not be obtainable and they decided not to go forward with the conversion of the vessels. Defendants, with the aid of plaintiff, or at least his acquiescence, cancelled outstanding equipment orders, sold the equipment that had already been delivered, and terminated the employment of OMDI personnel.

In 1977, plaintiff instituted this suit asserting nine causes of action sounding in tort and contract. At the heart of plaintiff's complaint is his belief that the proposed venture "ultimately failed due to defendants' breach of their contractual obligations, primarily their negligent and unsuccessful attempts to find charterers for the drillships." Plaintiff's Memorandum of Law at 2.

*Count I*

In Count I of the amended complaint, plaintiff alleges that defendants breached the Drilling Agreement by failing to perform their obligations thereunder, e. g., to convert the vessels and transfer them to OMDI. Defendants contend that they could not have breached their obligations under the Drilling Agreement because that Agreement never became effective; that

paragraph 17 of the Drilling Agreement, which stated that the other provisions of the Agreement did not become effective until after OMDI obtained an initial charter for the two vessels, constituted a condition precedent to the effectiveness of the Drilling Agreement; and that since no acceptable charter was ever obtained for OMDI, defendants' obligations under the Agreement never accrued.

Plaintiff contends, however, that defendants, by their conduct, waived any condition precedent stated in paragraph 17; that under paragraph 6a of the Drilling Agreement defendants were obligated to use their "best efforts" to obtain an initial charter for OMDI; that defendants breached their obligation under paragraph 6a by improperly employing ship brokers to seek charters for the two vessels whereas it is the custom and practice in the oil drilling industry for the owner of a vessel to negotiate directly with prospective charterers.

Defendants respond that it was plaintiff's responsibility to arrange for the initial charter since, pursuant to paragraph 17, paragraph 6a did not become operative until *after* an initial charter was obtained or that even assuming, for purposes of this motion only, that defendants were obligated to use their best efforts to solicit the initial charter for OMDI, that plaintiff's deposition testimony conclusively establishes that defendants acted in good faith and without any malice towards Robbins and that their decision to utilize ship brokers was merely a "business decision" with which plaintiff disagreed.

■ The Court concludes that a genuine issue of fact exists with respect to whether defendants were contractually bound to use their best efforts to solicit the initial charter for the vessels. The parties have not cited any contract provision which resolves the issue of which party was to have primary responsibility for the solicitation of the initial charter. Furthermore, plaintiff alleges that in a conversation he had with defendants' representative prior to the execution of the Drilling Agreement, he was

led to believe that defendants were to have full control over negotiations for charters.

■ Assuming, for purposes of this motion only, that defendants were obligated to use their best efforts to arrange for charters, the Court further concludes that an issue of fact exists with respect to whether defendants fulfilled their duty in this regard. Defendants argue that plaintiff's testimony establishes that they acted in good faith. The case law [2] establishes, however, that in determining whether a party has satisfied its obligation under a best efforts clause, a court's inquiry is not limited to a determination of whether that party acted with malice; in most of the cases that defendants rely on to support their contention that no issues of fact exist with respect to the issue of whether defendants fulfilled their alleged duty to exercise their best efforts, the court conducted a trial to explore the full extent of a defendant's efforts to comply with its contractual obligation, as well as the prevailing business practices in the particular field. See, e. g., *Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609 (2d Cir. 1979) (after trial, court found a breach of a best efforts clause); *Western Geophysical Co. v. Bolt Associates, Inc.*, 584 F.2d 1164 (2d Cir. 1978) (trial conducted to determine whether defendant exercised its best efforts, defined as "active exploitation in good faith"); *Arnold Production, Inc. v. Favorite Films Corp.*, 176 F.Supp. 862, 865–67 (S.D.N.Y.1959), *aff'd*, 298 F.2d 540, 542 (2d Cir. 1962) (trial on plaintiff's allegation that the method employed by defendant for television distribution of plaintiff's films did not amount to exercise of best efforts). In the case at bar, plaintiff's contention that defendants' method of operation was contrary to the well known method of doing business in the oil drilling industry is sup-

ported, at least in part, by the deposition testimony of Michael Klebanoff, defendants' employee, who testified that he was aware that potential charterers resented the interference of brokers in negotiations for charters. On the basis of the record presently before the Court, it appears that plaintiff will have a very difficult case to prove at trial because, despite the efforts of both parties—plaintiff, who contacted potential charterers directly, and defendants, who dealt through brokers—a charter was never obtained for OMDI. The difficulty of plaintiff's proof is not the test on summary judgment; rather, "[h]owever fragile plaintiff['s] claim may appear summary judgment is not designed to weed out dubious claims, but only those with no basis in material fact." *Weight Watchers of Quebec Ltd. v. Weight Watchers International, Inc.*, 398 F.Supp. 1047, 1055 (E.D.N.Y.1975). Accordingly, defendants' motion for summary judgment on plaintiff's first cause of action is denied.

*Count II*

In Count II, plaintiff asserts a tort claim based upon defendants' alleged breach of the best efforts clause: Robbins contends that by reason of the Drilling Agreement, defendants had a duty to him to use their best efforts to arrange for an acceptable charter and that they negligently performed that duty, resulting in damage to plaintiff in the amount of $15,000,000.

Defendants argue that Count II merely seeks to convert a breach of contract claim into a tort claim by alleging that a "duty" was negligently violated.

■ In the absence of special additional allegations of wrongdoing, a breach of contract does not give rise to a tort action.

---

**2.** The parties have stipulated that under New York's conflict of laws rules, New York law applies to each of the issues raised by the motions for summary judgment. New York has had significant contacts with this action; for example, the Drilling Agreement, which forms the basis for the bulk of plaintiff's claims, expressly provides that it is to be governed by and interpreted pursuant to the laws of the State of New York, Drilling Agreement at ¶ 15. New York conflict of laws rules, applied by this Court pursuant to the mandate of *Klaxon Co. v. Stentor Electric Mfg. Co., Inc.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), give great deference to such an expression of intent in the contract itself. Since New York law bears a reasonable relation to the transaction, it will be applied in accordance with the parties' choice.

For one party to a contract to sustain a tort claim against another party to the contract, there must be alleged a breach of a legal duty separate and distinct from any contractual obligations, although the genesis of the duty may be the contract itself. *Stella Flour & Feed Corp. v. National City Bank*, 285 A.D. 182, 136 N.Y.S.2d 139 (1st Dept. 1954), *aff'd*, 308 N.Y. 1023, 127 N.E.2d 864 (1955). See also *Luxonomy Cars, Inc. v. Citibank, N. A.*, 65 A.D.2d 549, 408 N.Y.S.2d 951 (2d Dept.1978).

In *Rich v. New York Central & Hudson R.R. Co.*, 87 N.Y. 382, 398 (1882), the court stated that:

"[S]uch legal duty may arise . . . out of certain relations of trust and confidence, inherent in the nature of the contract itself [or] may spring from extraneous circumstances, not constituting elements of the contract as such, although connected with and dependent upon it, and born of that wider range of legal duty which is due every man to his fellow, to respect his rights to property and person and refrain from invading them by force or fraud."

Although plaintiff states in a conclusory manner that his second claim alleges a breach of a legal duty separate and distinct from any contractual obligation, he fails to specify what special relationship existed between himself and defendants. Moreover, paragraph 10 of the Drilling Agreement expressly provides that:

"Nothing herein shall (a) create a partnership, joint venture, trust or other fiduciary relationship between OMDI and [Robbins]."

Plaintiff relies on *Blue Grass Partners v. Bruns, Nordeman, Rea & Co.*, (N.Y.Sup.Ct. 1978) (N.Y.L.J. 6/30/78, p. 6, col. 3), for the proposition that a best efforts obligation "creates [such] an extraordinary relationship between obligors and obligee . . ." Plaintiff's Main Brief at 67. In *Blue Grass*, plaintiffs and defendants entered into an underwriting agreement whereby defendants undertook to use their best efforts to offer and sell limited partnership interests in Blue Grass Partners. The court held

that although no fiduciary duty to plaintiffs arose by virtue of the underwriter-issuer relationship between the parties, plaintiffs' allegation that defendants failed to use the reasonable care and skill required by a best efforts underwriting stated a cause of action in negligence. The *Blue Grass* court relied on the First Department's decision in *Rosenbaum v. Branster Realty Corp.*, 276 A.D. 167, 93 N.Y.S.2d 209, 211 (1st Dept. 1949) wherein the court held that:

"where a person contracts to do certain work he is charged with the common law duty of exercising reasonable care and skill in the performance of the work required to be done by the contract. It is the breach of the duty imposed by law and not of the contract obligation which constitutes the tort. While such duty may arise out of contract, it is a separate and distinct undertaking . . . ." (citation omitted).

■ *Blue Grass* and *Rosenbaum* illustrate the rule that negligent performance of an undertaking to do work gives rise to an action in tort and for breach of contract. See also *Trans Caribbean Airways, Inc. v. Lockheed Aircraft Service-International, Inc.*, 14 A.D.2d 749, 220 N.Y.S.2d 485 (1st Dept. 1961). As defendants point out, the instant case does not involve a service contract but a business arrangement wherein both parties were to perform their obligations for their mutual benefit; thus, the independent duty imposed by law on one who performs services for another is not implicated in this case and the decisions in *Blue Grass* and *Rosenbaum* are distinguishable.

■ In the instant case, the duties of the parties arose solely out of the contract; plaintiff's remedy lies in his breach of contract claim. See, *e. g., Luxonomy Cars, Inc., supra* (allegations that defendant recklessly accelerated loan and failed to exercise reasonable care in so doing does no more than assert violations of a duty which are identical to and indivisible from the contract obligations which were allegedly breached). For the foregoing reasons, defendants-motion for summary judgment on

Count II of the amended complaint is granted.

## Count III

■ In Count III, plaintiff alleges that defendants breached the Employment Agreement; that plaintiff has performed all of his obligations thereunder but that defendants have failed to pay him for his services. Defendants allege that the Employment Agreement, like the Drilling Agreement, would have become effective only upon the fulfillment of the condition precedent expressed in paragraph 17 of the Drilling Agreement and since no initial charter was ever obtained, the Employment Agreement never became operative. Since the Court has determined that an issue of fact exists with respect to whether the condition precedent was waived by defendants' conduct,[3] see discussion at Count I, *supra*, defendants' motion for summary judgment on Count III is denied.

## Count IV

In Count IV, plaintiff asserts that defendants have been "unjustly enriched" in the amount of $175,000 by their receipt of plaintiff's services from November 1, 1974 to the present.[4] Defendants contend that plaintiff cannot recover under a quasi-contract theory because any services performed by plaintiff prior to the time that the Employment Agreement became effective were performed (1) for the mutual benefit of both parties; and (2) with a written understanding, as expressed in the Employment Agreement, that Robbins would not be compensated therefor.

It is unclear whether plaintiff is seeking recovery of the value of his services under a *quantum meruit* theory or quasi-contract theory:

"Under New York law, where there is an express employment contract setting terms of compensation, an action will not lie in *quantum meruit*. [However,] where an employment contract has been breached by the employer, the aggrieved employee may elect between suing for his compensation under the terms of the contract or suing in *quantum meruit* for the reasonable value of the work performed, minus the value of any payments received . . . . A quasi-contract obligation, by contrast, is one imposed where there has been no agreement by the parties but where one party has been unjustly enriched and in equity and good conscience should compensate another. The concept has been extended to cover services received where a defendant has not contracted to receive such services but receives benefit therefrom and 'it would be against good conscience for the defendant to retain the benefits . . . without compensating the plaintiff for the services he fully performed . . .'" *Seymore v. Reader's Digest Association, Inc.*, 493 F.Supp. 257 (WCC) at 264, 265 (citations omitted).

■ In the instant case, although the understanding between the parties was expressed in a written agreement, plaintiff may have a *quantum meruit* claim if the Court finds that defendants breached the Employment Agreement. See *Dieterle v. Gatton*, 366 F.2d 386, 388 (6th Cir. 1966); *S.*

---

3. Plaintiff also alleges that by oral agreement with defendants, his salary was to accrue from the date the Agreement of Intent was signed, May 30, 1974 and that defendants, by their conduct, confirmed the existence of such an oral agreement.

4. Plaintiff, in his affidavit at ¶ 11, states that his unjust enrichment claim relates to the period from June 1974 to June 1975. After June 1975, plaintiff assisted defendants in disposing of the equipment owned by OMDI. Although defendants contend that they were not obligated to compensate plaintiff for his efforts to

dispose of the equipment during that period, see terms of the Agreement of Intent at page 4, *supra*, they paid him $30,000 for the approximately 30 days that plaintiff alleges that he spent on OMDI business after June 1975. Defendants contend that Robbins has no *quantum meruit* or quasi-contract claim for this period of time since he has been paid at more than the contract rate for his services after June 1975. By limiting his claim under Count IV to services performed up to June 1975, plaintiff appears to agree. See also Plaintiff's Statement under Local Rule 9(g) at ¶¶ 25–31.

*T. Grand, Inc. v. Cedar Bay Park Corp.*, 14 Misc.2d 428, 182 N.Y.S.2d 747 (1958).

If the Court concludes that defendants did not breach the Employment Agreement and that it simply never became effective, however, plaintiff would have no *quantum meruit* claim. Such a claim is based upon proof that the employee's services were "accepted under such conditions that the officers of defendant as reasonable men ought to have understood that they were to be paid for," *Alves v. City of New York*, 282 A.D. 232, 122 N.Y.S.2d 448 (1st Dept. 1953), *aff'd*, 306 N.Y. 813, 118 N.E.2d 822 (1954); *Bush v. Springall*, 36 N.Y.S.2d 708, 711 (Sup.Ct.1942); however, the written agreement did not provide for Robbins to be compensated for his services prior to the time that OMDI obtained a charter and therefore it would have been unreasonable for Robbins to expect remuneration prior to that time. *Dieterle, supra* (if court finds that under agreement, the plaintiff was not entitled to compensation until bank began operating, plaintiff would have no reasonable ground to expect compensation for his services prior to that time). See generally *Williams v. Adams*, 250 A.D. 603, 295 N.Y.S. 86, 94 (1st Dept. 1937); *Knudtsen v. Remmel*, 141 A.D. 445, 126 N.Y.S. 249 (1910) (where services are performed for the mutual benefit of all parties concerned, the law will not imply a promise to reimburse). Plaintiff's complaint does not clearly state a claim for *quantum meruit* based on an election of that remedy following breach of contract. Since such a claim appears possible on these facts, however, he may amend his complaint to state a *quantum meruit* claim.

With respect to plaintiff's unjust enrichment claim, the Court concludes that Robbins has failed to raise a triable issue of fact. A quasi-contract claim is implied only under well defined circumstances. It rests upon the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another. Robbins has failed to state, except in the most general and conclusory terms, how his services benefited defend-

ants. It is undisputed that the aborted business venture failed to generate any revenues for either party and that in fact both parties incurred heavy losses. By definition, there can be no unjust enrichment without enrichment.

In summary, defendants' motion for summary judgment on Count IV is granted to the extent that Count IV alleges a claim for unjust enrichment; plaintiff may amend his complaint to more clearly state a claim for *quantum meruit*, however.

*Counts V and VI*

In Counts V and VI, plaintiff alleges that defendants intentionally and maliciously misrepresented that they would perform their obligations under the Drilling Agreement and the Employment Agreement and that he relied thereon.

The essential elements of a cause of action sounding in fraudulent inducement or misrepresentation in the making of a contract are (1) a false representation of a material fact; and (2) reliance thereon by plaintiff to his detriment. The "action cannot be based solely upon a mere failure to perform promises of future acts. A failure so to perform is merely a breach of contract, which must be enforced by an action on that contract." *Wegman v. Dairylea Cooperative, Inc.*, 50 A.D.2d 108, 376 N.Y. S.2d 728, 734 (4th Dept.1975). See also *Miller v. Volk & Huxley, Inc.*, 44 A.D.2d 810, 355 N.Y.S.2d 605 (1st Dept.1974) ("It is recognized that a cause of action for fraud will not arise when the only fraud charged related to a breach of contract.") Where a party to a contract enters into the contract with a preconceived and undisclosed intention not to perform his obligations thereunder, he will be subject to an action for fraud, see *Sabo v. Delman*, 3 N.Y.2d 155, 164 N.Y.S.2d 714, 718, 143 N.E.2d 906 (1957).

In paragraph 10 of his affidavit, Robbins summarizes his claim in these two counts:

"[I]t is well-settled that an action for fraud is available if a person promises to do something when in fact he never had an intention of keeping that promise.

That is the essence of my claim for misrepresentation."

In his answering papers, plaintiff states that summary judgment would be inappropriate on his fraudulent inducement claim because "the issues of intent, reliance and materiality are disputed questions of fact." However, Robbins has neither alleged nor suggested any facts from which a jury could infer that defendants entered into the Drilling Agreement and the Employment Agreement with a preconceived intent not to perform thereunder. Furthermore, Robbins' own testimony contradicts his fraud claim:

"Q. Do you believe that defendants entered into [the Agreements] in sound business judgment with you and with the expectation that you would both make a profit?

"A. I believe that."

Robbins' Deposition Testimony at 481.

Since plaintiff has failed to raise a genuine issue of fact respecting an alleged preconceived intent on defendants' part not to perform under the Agreements and since plaintiff has not alleged any other misrepresentations by defendants in the making of the contracts, defendants' motion for summary judgment on Counts V and VI is granted.

*Counts VII, VIII & IX*

In the last three counts of the amended complaint, Robbins alleges that defendants wrongfully interfered with his business relationships with third parties, including suppliers and the Norwegian investors. In Count VII, he asserts that defendants, by discharging OMDI's employees and cancelling OMDI's outstanding equipment orders, presumably after defendants had decided to terminate their business venture with Robbins, have interfered with his business relationships with suppliers, who will no longer sell to Robbins on credit but demand that he pay cash. In Counts VIII and IX, Robbins alleges that through misrepresentations defendants interfered with his contractual relationships by (1) lulling him into not exercising his alleged option to purchase OMI's two cargo ships and (2) leading him to break off his negotiations with the Norwegian investors. The misrepresentations referred to in Counts VIII and IX are those referred to in Robbins' fraudulent inducement claim, *i. e.*, that defendants never intended to perform under the Agreements.

Robbins' allegations that defendants wrongfully interfered with his business relationships with either his suppliers or the Norwegian investors could state a cause of action under either a *prima facie* tort theory or a theory of intentional interference with contractual relationships; plaintiff states that his claims are based solely on the latter theory. The essential elements of such an action are: (1) the existence of a valid contract between plaintiff and another contracting party; (2) defendant's knowledge of that contract; (3) defendant's intentional procurement of breach of that contract by the other party, and (4) damages. *Israel v. Wood Dolson Co.*, 1 N.Y.2d 116, 151 N.Y.S.2d 1, 5 (1956).

With respect to plaintiff's claim that defendants interfered with his existing contracts with suppliers, plaintiff's claim is dismissed for failure to plead in nonconclusory language facts establishing all the foregoing elements of a wrongful and intentional interference with his contractual right. *Benton v. Kennedy-Van Saun Mfg. & Eng. Corp.*, 2 A.D.2d 27, 152 N.Y.S.2d 955 (1st Dept.1956). See also *Goldfarb v. Strauss*, 27 Misc.2d 616, 212 N.Y.S.2d 579 (Sup.Ct.1961).

Plaintiff's claim that defendants interfered with his allegedly existing option to purchase the cargo vessels must be dismissed as well. Under New York law, defendants cannot be guilty of inducing the breach of their own contract. *Ryan v. Brooklyn Eye & Ear Hospital*, 46 A.D.2d 87, 360 N.Y.S.2d 912 (2d Dept.1974) (physician seeking damages for alleged interference with economic relations could not recover against hospital for inducing breach of his alleged contract to use hospital's facilities since such right could only come from the hospital and it could not induce a breach of its own contract).

To the extent that plaintiff claims that defendants interfered with his prospective business relations with suppliers and the Norwegian investors, those claims must be dismissed as well.

The mere fact that the alleged interference was at a precontractual stage, rather than involving an existing contract, is not determinative.

■■■ It is well settled that interference with precontractual relations is actionable when a contract would have been entered into had it not been for the conduct of the defendant. *Williamson, Picket, Gross, Inc. v. 400 Park Avenue Co.*, 63 A.D.2d 880, 405 N.Y.S.2d 709 (1st Dept.1978); *Williams & Co., Inc. v. Tuttle & Co.*, 6 A.D.2d 302, 176 N.Y.S.2d 99 (1st Dept.1958), *aff'd*, 47 N.Y.2d 769, 417 N.Y.S.2d 460, 391 N.E.2d 296 (1979); W. Prosser, *Law of Torts*, 951–52 (4th ed. 1971). Where a contract exists, intentional interference by the defendant is actionable even in the absence of malice and even where the motive is the self-interest of the defendant, *Noah v. Daitch & Co., Inc.*, 22 Misc.2d 649, 192 N.Y.S.2d 380, 386 (Sup.Ct.1959). In a case where there is no existing contract, by contrast, there is no liability for inducing a termination of the relationship between plaintiff and the other party who is negotiating with plaintiff where the defendant's purpose is to advance his own economic self-interest. *Id.* Only if the defendant's sole purpose is to damage the plaintiff, or if the means employed to induce a termination of the relationship are dishonest, unfair or in any other way improper, is the defendant's conduct actionable. *Id.* See also *Rosenberg v. Del-Mar Division*, 56 A.D.2d 576, 391 N.Y.S.2d 452 (2d Dept.1977); *Livoti v. Elston*, 52 A.D.2d 444, 384 N.Y.S.2d 484 (2d Dept.1976); *Ryan, supra; Goldfarb, supra; Susskind v. IPCO Hospital Supply Corp.*, 49 A.D.2d 915, 373 N.Y.S.2d 627 (2d Dept.1975). Dean Prosser notes that he has found no case in which intended but purely incidental interference resulting from the pursuit of the defendant's own ends by proper means been held to be actionable. *Id.* at 952. The difference between the proof required to establish a claim for intentional interference with an existing contract and that required where a prospective contract is involved is based on the policy of fostering free enterprise: absent a definite and existing contract, another party is free to compete for plaintiff's services. See *Terry v. Dairymen's League Co-operative Ass'n, Inc.*, 2 A.D.2d 494, 157 N.Y.S.2d 71 (3d Dept.1956).

■■■ Robbins does not allege that defendants' sole purpose in inducing him to work with them rather than with the Norwegians was to harm him;[5] nor does he allege that defendants utilized unlawful or improper means to solicit his participation in OMDI.[6] And in fact there is no evidence in the present record to support such an allegation. Robbins has acknowledged that defendants were motivated, at least in part, by their desire to reap a profit from the business arrangement. On such facts, no

---

**5.** Plaintiff testified as follows:

"Q. Do you believe that the defendants induced you to enter into the [Drilling and Employment Agreements] and also the Agreement of Intent, for the sole purpose of preventing you from capitalizing on the Norwegian deal?

"A. The sole purpose, no."

Plaintiff's Deposition Testimony at 481.

With respect to defendants' intent, plaintiff further states in his affidavit at ¶ 13:

"The facts show that defendants' [sic] interfered with my business relations. . . . It is my opinion that the defendants did those acts intentionally, by which I mean that they intended that I should forego those opportunities because of the deal that defendants wanted me to do with them."

**6.** Plaintiff testified that at a meeting between himself and defendants in New York in May 1974 to discuss the proposed business arrangement, the following was said regarding plaintiff's arrangement with the Norwegian investors:

"Q. What was said on the subject?

"A. That I had to come to a decision, and very shortly, because I felt I should notify the Norwegian people, it was a matter of business courtesy to notify them that I wasn't going to continue negotiating with them if we were going to reach an agreement."

Plaintiff's Deposition Testimony at 249. See also Rice Deposition at p. 82.

cause of action for intentional interference with plaintiff's prospective business relations with the Norwegian investors exists. See generally *Williamson, Picket, Gross, Inc., supra* (dicta); *Livoti, supra* (so long as change of heart was not induced by any fraud or misrepresentation, plaintiff has no cause of action for inducing breach of contract otherwise unenforceable). Furthermore, with respect to plaintiff's claim that he terminated his negotiations with the Norwegians as a result of misrepresentations by defendants, the Court has previously concluded that plaintiff has failed to raise a genuine issue of fact respecting such alleged misrepresentations. See discussion, *supra.*

For the same reasons, the Court finds that no claim arises out of plaintiff's allegations respecting prospective contractual relations with his suppliers. Again, plaintiff fails to specify any unlawful or improper acts by defendants which resulted in the change in the credit terms he alleges that he has been offered by suppliers,[7] nor did he testify under oath that defendants cancelled the equipment orders solely to injure him. See *Susskind, supra.*

For the foregoing reasons, defendants' motion for summary judgment on Counts VII, VIII and IX is granted.

### First Counterclaim

Defendants have no objection to a dismissal of their first counterclaim; accordingly, it is hereby dismissed.

### Second Counterclaim

Defendants' second counterclaim alleges that:

"Prior to entering into the agreements alleged in the complaint, and to induce defendants OMI and OMDI to enter into said agreements, plaintiff knowingly, falsely and fraudulently represented that plaintiff was a person with extensive experience in the oil drilling business who had been previously involved in substantial deals of a similar nature, was thoroughly knowledgeable in the oil drilling business and had substantial contacts in the industry."

Plaintiff urges that the second counterclaim be dismissed, first, on the ground that defendants have not pleaded the allegations of fraud with sufficient particularity. The Court finds that the allegations are sufficient: the statements that defendants allege to be false and fraudulent, *i. e.,* that Robbins had extensive experience in the oil drilling industry and that he had been previously involved in similar arrangements, are set forth.

Plaintiff's second ground for dismissal is that his statements to defendants fall into the category of opinions, which are not sufficient foundation for an action for deceit. However, some of Robbins' representations were statements of fact, not merely opinion. Accordingly, plaintiff's cross-motion for summary judgment on the second counterclaim is denied.

### Summary

Defendants' motion for summary judgment on Counts II, IV (to the extent it states a quasi-contract claim), V, VI, VII, VIII and IX is granted; defendants' motion for summary judgment on Counts I and III is denied. Plaintiff may amend his complaint to state a claim for *quantum meruit* in Count IV. Plaintiff's cross-motion for summary judgment on the first counterclaim is granted; his cross-motion for summary judgment on the second counterclaim is denied.

So ordered.

---

7. Nor can the Court infer from plaintiff's testimony respecting the circumstances surrounding the decision to cancel OMDI's outstanding equipment orders that defendants decided to do so solely to harm plaintiff.